**FILED**

September 16, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| THE LUTHERAN CHURCH – MISSOURI SYNOD, a Missouri nonprofit corporation | § § | |
| *Plaintiff*, | § | |
| | § | **Case No. 1:23-cv-1042-DE** |
| v. | § | **[Consolidated with 1:24-cv-00176-DE]** |
| | § | |
| DONALD CHRISTIAN, CHRISTOPHER | § | |
| BANNWOLF, CONCORDIA | § | |
| UNIVERSITY TEXAS, INC., & JOHN | § | |
| DOES 1-12 | § | |
| *Defendants* | § | |

## DEFENDANT CONCORDIA UNIVERSITY TEXAS, INC'S
## MOTION FOR A PROTECTIVE ORDER

Defendant Concordia University Texas, Inc. ("CTX") submits this Motion asking that the Court issue a Protective Order prohibiting the Lutheran Church – Missouri Synod nonprofit corporation ("LCMS") from seeking the disclosure of CTX's privileged information through discovery and *ex parte* communications with CTX's current and former governing officials as follows:

## I.       INTRODUCTION

1.       LCMS issued third-party subpoenas to former Regents of CTX's governing board. The subpoenas demand the former Regents attend a deposition and bring documents responsive to 58 categories of requests. The majority of requests seek documents which reveal the internal deliberations of CTX's governing board and corporate officers in deciding matters of CTX's governance and religious polity. As CTX is a religious organization, such information and materials are protected by the 1st Amendment rights and privileges of CTX and its leadership and supporters. Furthermore, LCMS requests materials protected by the attorney-client, and work-

1

product privileges of CTX. CTX therefore seeks protection of the Court to prevent the disclosure of this privileged information.

## II.     EXHIBITS

2.      This motion is supported by the following exhibits:

   a.   **Exhibit 1** – Declaration of Dr. Donald Christian

   b.   **Exhibit 2** – Declaration of Reverand Dr. Stephen Sohns

   c.   **Exhibit 3** – Amended Third-Party Subpoena of Alan Taylor

   d.   **Exhibit 4** – Amended Third-Party Subpoena of Nathaniel Hill

   e.   **Exhibit 5** – Amended Third-Party Subpoena of Tom Zachman

   f.   **Exhibit 6** – CTX's Objections to LCMS's Exhibit A to Third-Party Subpoenas

   g.   **Exhibit 7** – September 9, 2024 correspondence from LCMS's counsel

   h.   **Exhibit 8** – Defendant LCMS's Motion for Protective Order, *Hotchalk v. LCMS et al.*, Cause No. 20CV15620 (4th Cir. Ct. OR., Aug. 27, 2021)

   i.   **Exhibit 9** – Defendant LCMS's Reply in Support of its Motion for Protective Order, *Hotchalk v. LCMS et al.*, Cause No. 20CV15620 (4th Cir. Ct. OR., Nov. 23, 2021)

   j.   **Exhibit 10** – CTX's Amended Bylaws (Ex. M to LCMS's Complaint)

## III.     FACTS

3.      <u>CTX's Board and Officers.</u> CTX is a Christian university where the education of students is rooted in Lutheran traditions and the Lutheran Learning Framework. **Ex. 1** at ¶ 2. It is governed by a Board of Regents ("Board"). **Ex. 2** at ¶ 2. All Regents must be members of a Lutheran Church – Missouri Synod congregation. *Id*. The Board is composed of Lutheran church workers, pastors, current or former educators, and others who desire to serve CTX's mission of providing education to students rooted in Lutheran traditions. *Id*. The Board's primary responsibility is to define and ensure the fulfillment of CTX's mission. *Id*. The Board is aided in its work by the officers of CTX's

leadership team which include CTX's current President/CEO Dr. Donald Christian ("Christian"), a defendant in this lawsuit, and Provost/Executive Vice President Kristi Kirk ("Provost Kirk"). *Id*. at ¶ 5; **Ex. 1** at ¶¶ 4-5. The Board also relies on CTX's attorneys to advise it on decisions which affect governance of the organization. *Id*. at ¶ 4.

4.     <u>The Board votes to amend CTX's governing documents.</u> On April 29, 2022, the CTX Board of Regents voted to amend the purpose clause of its charter in order to obtain its own 501(c)(3) tax exempt designation. **Ex. 1** at ¶9. On November 8, 2022, the Board voted to amend CTX's Charter, Bylaws, and Handbook through a blind, confidential vote. **Ex. 1** at ¶ 6. The acting Board Secretary, former regent Jim Cleary, collected the anonymous paper ballots of Regents physically present in the room. *Id*. Those Regents who attended the meeting remotely either submitted their vote to Jim via electronic chat in the Zoom meeting application or via email. *Id*. After that meeting, Regents Nathan Hill and Tom Zachman resigned from the Board. *Id*. On April 4, 2023, in another blind vote, the Board reaffirmed its decision on November 8, 2022 to amend its governing documents. **Ex. 1** at ¶ 8. After that meeting, Regent Alan Taylor resigned from the Board. *Id*. CTX's attorneys were present at the April 29th, November 8th and April 4th Board meetings. **Ex. 1** at ¶ 7-9. They advised the Board on amending its governing documents and later affirming the November 8th decision. **Ex. 1** at ¶ 7. Prior to each of these meetings, Regents exchanged documents and communications between themselves, and with President Christian. **Ex. 1** at ¶ 7-8. These documents and communications frequently included advice from CTX's attorneys. *Id*.

5.     <u>LCMS files suit</u>. LCMS filed suit against CTX, Christian, and the former head of CTX's Board of Regents, Christopher Bannwolf ("Bannwolf"), and twelve John Does on September 1, 2023. **Plaintiff's Original Complaint Clerk Doc. 1**. LCMS amended the Original Complaint on February 29, 2024. **Plaintiff's First Amended Complaint, Clerk Doc. 11** (hereafter

"**Complaint**"). The suit alleges that (1) CTX did not have the authority to amend its governing documents without prior authorization from LCMS; (2) CTX breached a contractual obligation to LCMS; (3) CTX, Christian, Bannwolf, and the Doe defendants have breached fiduciary duties to LCMS; (4) Christian and CTX violated the Texas Business Organizations code; and (5) Christian tortiously interfered with a contract. **Complaint** at ¶¶ 48-81. Though there may be disagreements regarding some facts, it is undisputed that CTX amended its governing documents to reflect self-governance.

6.    <u>CTX contemplated litigation prior to November 8, 2022</u>. Prior to amending its governing documents, CTX was in protracted negotiations regarding its relationship with LCMS and its synodical counterpart Lutheran Church – Missouri Synod, the association of Lutheran Congregations ("Synod"). **Ex. 1** at ¶ 7. By February 25, 2022, CTX had anticipated that litigation was likely to ensue if it proceeded to amend its governing documents to alter its relationship with Synod. *Id*. Beginning as early as February 25, 2022, CTX's Officers and Board of Regents prepared documents and engaged in communications in preparation for the anticipated litigation. *Id*.

7.    <u>LCMS issues third-party subpoenas to former Regents.</u> On September 4, 2024, LCMS issued amended third-party subpoenas to Alan Taylor, Nathaniel Hill, and Tom Zachman. **Exs. 3-5**. Each are former Regents of CTX's Board. *See* **Ex. 1** at ¶¶ 7 & 9. The subpoenas command Taylor, Hill, and Zachman to give testimony and to produce documents responsive to 58 categories of requests. **Exs. 3-5**. The 58 categories of documents requested in the subpoenas include: a) communications between Regents; b) communications between Regents and President Christian and Provost Kirk; and c) documents, and/or notes regarding:

- All CTX Board of Regents meetings since January 2000;
- CTX's decision to amend its governing documents;

- CTX's decision affirming the amendments to its governing documents;
- CTX's selection and seating of new Regents;
- The opinions and positions of CTX's Regents on these various topics;
- Communications with CTX's donors; and
- CTX's current President and any process of Presidential Selection.

*See e.g.* **Exs. 3-5**, Ex. A. It is CTX's understanding that LCMS has also been in communication with Jim Cleary, the former regent and secretary of CTX's Board of Regents in regard to selecting a date to subpoena him.

8. <u>CTX objected to these requests</u>. On September 3, 2024, CTX formally objected to LCMS's request for these documents asserting First Amendment, attorney-client, and work-product privileges, as well as objections as to relevance. **Ex. 6**. CTX requested that LCMS rescind these requests. **Ex. 6**. LCMS refused to rescind the requests, offering only to review documents containing attorney-client or work-product privileges with CTX after they had been produced. **Ex. 7**. CTX has also issued letters to Taylor, Hill, Zachman, Cleary, other former Regents, and all current Regents asserting privileges to the information contained in documents responsive to LCMS's requests. **Ex. 1** at ¶ 15.

9. <u>Impacts of compelled disclosure</u>. Court compelled production of internal documents and communications of CTX's leadership regarding the governance and religious polity of CTX will adversely affect CTX and its regents and officers because CTX's officers will rely less on electronic mail, text messages, or app-based messaging to communicate with members of CTX's leadership team. **Ex. 1** at ¶ 10; **Ex. 2** at ¶ 6. If notes or other recordings of Board meetings are compelled, CTX's leadership will be less likely to share their thoughts with CTX's Board members or take notes on their conversations for later contemplations. **Ex. 1** at ¶ 10; **Ex. 2** at ¶ 6. Fear that the content of the Board's debates, discussions, and decision-making processes will be made available through Court proceedings to legal adversaries will affect the speed and ease with which members of the Board of Regents are able to develop and decide matters of governance and

religious polity. **Ex. 1** at ¶ 10; **Ex. 2** at ¶ 6. All of this will undermine CTX's governing leaders to timely and freely communicate about faith-based and governance matters. **Ex. 1** at ¶ 10; **Ex. 2** at ¶ 6. Compelled disclosure of internal documents and communications will identify specific Regents' opinions and votes regarding controversial decisions, like the decision to amend the governing documents and the choice of Regents to be seated on the Board. **Ex. 1** at ¶ 11; **Ex. 2** at ¶ 7. This could also open current and former Regents to reprisals such as hostile receptions from colleagues in the church, potential disciplinary action from their ecclesiastical supervisor, and/or expulsion from LCMS. **Ex. 1** at ¶ 11; **Ex. 2** at ¶ 7. The LCMS could also take action to remove a pastor or commissioned minister from the roster of Synod, which could have an adverse effect on the pastor or commissioned minister continuing to serve his or her church or remain in his or her ministry position as before. **Ex. 2** at ¶ 7. In fact, the Synod in convention has already called on ecclesiastical supervisors of Regents to investigate and determine any appropriate disciplinary actions against the acting Regents. **Ex. 1** at ¶ 12. In addition, knowing that any future communications among Regents may be compelled through Court proceedings will likely prevent individuals interested in acting as a CTX regent from pursuing that position. **Ex. 1** at ¶ 11.

### IV.     ARGUMENT

10.     <u>Discovery Rules</u>. Parties are only entitled to discovery regarding "nonprivileged matter[s] that [are] relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). For good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" including by "forbidding the disclosure or discovery" and "forbidding inquiry into certain matters or limiting the scope of disclosure or discovery to certain matters." *Id*. at 26(c)(1)(A)&(D). In addition, a court "must

quash or modify a subpoena that requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A).

11.   <u>First Amendment Privileges.</u>  An objection "to a discovery request as an infringement of the party's First Amendment rights is in essence [an assertion of] a First Amendment *privilege.*" *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2010) (emphasis in original). If the party makes a showing that the discovery has the effect of 'discouraging the exercise of constitutionally protected [] rights," then the discovery "must survive exacting scrutiny." *Perry*, 591 F.3d at 1139 (internal citations omitted); *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608, (2021) ("Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny."). The question is therefore "whether the party seeking the discovery 'has demonstrated an interest in obtaining the disclosures it seeks…which is sufficient to justify the deterrent effect … on the free exercise … of the constitutionally protected right…'" *Id*. at 1140 (quoting *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958)).

12.   <u>Freedom of Religion.</u> The Free Exercise clause of the U.S. Constitution is imbued with a "spirit of freedom for religious organizations, an independence from secular control or manipulation - - in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952); *see also Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018). The autonomy of religious organizations "is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). Compelled production of religious organizations' "internal communications" infringes on this right. *See Whole Woman's Health*, 896 F.3d at 371-72; *see also e.g. Rayburn v. Gen. Conference of Seventh-Day*

*Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (finding churches wary of investigations might begin to make decisions "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments.") In addition, the Religious Freedom Restoration Act (RFRA), prohibits compelled disclosure through discovery where litigants have a sincere claim of religious belief, a substantial burden on the exercise of that belief will be caused by the compelled disclosures, and where there is no compelling need for the imposition. *See Whole Women's Health*, 896 F.3d at 371.

13.     <u>Freedom of Association</u>. The Supreme Court has recognized "a right to association for the purposes of engaging in" First Amendment activities, such as the exercise of religion. *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). The Court recognizes that the freedom to worship "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id*. at 622. First Amendment infringements may exist where discovery requests may result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry*, 531 F.3d at 1140 (internal citation omitted). As to the latter, many courts have recognized the compelled disclosure of an association's "confidential internal materials…intrudes on the privacy of association and belief guaranteed by the First Amendment, as well as seriously interferes with internal group operations and effectiveness." *AFL-CIO v. FEC*. 333 F.3d 168, 177-78 (2003) (internal quotations omitted); *see also Whole Woman's Health*, 896 F.3d at 373-74 (revealing internal communications "not only interferes with [] decision making processes…but also exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government.");

*Perry*, 591 F.3d at 1142 (compelled disclosure of internal communications can chill exercise of the rights to "exchange ideas and formulate strategy and messages, and to do so in private.")

14.    <u>Attorney-client and work product privileges</u>. A corporate client "has a privilege to refuse to disclose, and prevent its attorneys from disclosing, confidential communications between its representatives and its attorneys when the communications were made to obtain legal services." *Rush v. Columbus Mun. Sch. Dist.*, No. 99-60910, 2000 U.S. App. LEXIS 39647, at *6 (5th Cir. 2000) (quoting *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). The privilege is designed to protect "full and frank communication between a corporation and its attorneys" and protects "all communications during a meeting between a [] board and its attorney for the purpose of obtaining legal advice, even those communications not addressed directly to the attorney." *Id*. (relying on *Upjohn Co. v. United States*, 449 U.S. 383 (1981). The work-product doctrine prohibits discovery of documents and tangible things "prepared in anticipation of litigation or for trial by or for another party or its representative" absent a showing of substantial need. Fed. R. Civ. P. 26(b)(3).

15.    <u>Privilege does not terminate upon a member of leaderships' departure</u>. Privileges held by or enforceable by corporate entities "certainly protects" documents and communications "which were privileged and which occurred during the employment relationship." *Sedtal v. Genuine Parts Co.*, No. 1:08-CV-413-TH JURY, 2009 U.S. Dist. LEXIS 136504, at *4 (E.D. Tex. 2009); *see also McGowan v. S. Methodist Univ.*, Civil Action No. 3:18-CV-141-N, 2023 U.S. Dist. LEXIS 63907, at *8 (N.D. Tex. 2023) (discussing the continuation of a corporate litigant's attorney-client privileges following the termination of employment); *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306 (E.D. Mich. 2000). The purposes of a corporation's privileges to documents and materials obtained by former leadership while in a position of leadership is not served unless there

is certainty that those documents and communications "will remain privileged after the employee leaves." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981).

### a. Third-Party Subpoenas

16.     <u>Overview</u>. LCMS has subpoenaed 58 separate categories of documents from CTX's former Regents. For the purposes of this motion, these 58 requests have been combined into 8 groups. Although there is much overlap in the arguments regarding these groups, each warrants some development of individual factual or legal analysis.

17.     <u>Group 1: internal documents, communications, and notes regarding CTX's amendment of its governing documents.</u> The subpoenas include more than 20 requests for documents regarding CTX's amendments of its governing documents. *See* **Exs. 3-5**, Ex. A. They seek:

(a) communications by the former Regents with any person, including CTX's President and Provost, other Regents, and members of the Texas District Board of Directors concerning, advising on, or relating to, the amendments including the passing or affirming the passage of the amendments, and the effect of the amendments; *See* **Exs. 3-5**, Ex. A, Nos. 3-4, 8-10, 17-18, 27-30, 32-33, and 45.

(b) documents concerning the intent of the amendments; *Id*. at No. 5.

(c) preliminary drafts of the amendments; *Id*. at Nos. 11 & 31.

(d) documents, video presentations, and computer presentations from the November 8, 2022 meeting when the Board voted on the amendments and April 4, 2023 meeting where the amendments were affirmed; *Id*. at Nos. 20-25. and

(e) documents reflecting how individual Regents voted on the amendments and later affirmation, as well as any documents reflecting the views of individual members on the amendments and affirmations. *Id*. at Nos. 43-44.

18.    Each of these requests seeks CTX's internal documents, and communications between CTX's governing members regarding CTX's governance. The use of the Court's subpoena power to compel this information is an intrusion into CTX and its leaderships' freedom of religion and violates RFRA. *See e.g. Whole Woman's Health*, 896 F.3d at 371-73. Given that CTX's governing leadership may face reprisals and have a decreased likelihood to rely on written and electronic communications, the ability of CTX's leadership team to engage in timely and free communications regarding important governance matters, its decision making, and its effectiveness will be undermined by the compelled production of these documents. **Ex. 1** at ¶¶ 10-11; **Ex. 2** at ¶¶ 6-7. This is an incursion into CTX and its leaderships' freedom to associate. *Whole Woman's Health* at 374; *see also AFL-CIO*, 333 F.3d at 177-78; *Perry*, 591 F.3d at 1142. LCMS ostensibly agrees that the notes, communications, and documents of a religious institutions' governing board is privileged under the First Amendment as it successfully argued this same position in front of an Oregon court last year regarding, in part, discovery requests which sought internal LCMS communications regarding governance of another Concordia university. **Exs.** 7-8; *see also Hotchalk, Inc. v. Lutheran Church-Missouri Synod*, 2022 Ore. Cir. LEXIS 5513 at *1-6.

19.    Moreover, CTX's attorneys were present at the April 29, 2022, November 8, 2022, and April 4, 2023, meetings to provide legal advice to CTX regarding the amendments. **Ex. 1** at ¶¶ 7-8. CTX's attorneys prepared draft amendments and written legal advice to CTX's leadership team regarding the amendments. *Id*. Any documents, communications, or notes which were exchanged between CTX's representatives that contain this advice is protected under CTX's attorney-client

privilege. *Rush*, 2000 U.S. App. LEXIS 39647, at *6. And, since CTX was aware that litigation would likely ensue as early as February of 2022, any documents prepared by CTX's representatives or attorneys in anticipation of this litigation is protected under CTX's work-product privilege. Fed. R. Civ. P. 26(b)(3).

20.     LCMS does not have a substantial need for or sufficient interest in the requested documents to overcome CTX's privileges. This suit is about whether CTX has the authority to amend its Bylaws, Articles of Incorporation, and Handbook. **Complaint** at ¶¶ 48-81. There is no dispute that CTX's Board made the amendments to its governing documents. Its intent in doing so, the opinions of its governing members while doing so, the drafts or anticipated impacts of its amendments, or advice it received will not impact the outcome of this case. CTX's Board took its actions; the only relevant question is whether it had the authority to do so under its governing documents. *See e.g. Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 609 (Tex. 2013) (applying neutral principles of law to review the governing documents of a religious organizations to determine control of the corporation.) CTX's governing documents are publicly available and in possession of LCMS. *See* **Complaint**, Exs. L-N. Therefore, LCMS cannot satisfy the "exacting scrutiny" for compelled disclosure of documents that would chill CTX's First Amendment rights, *see e.g. Ams. for Prosperity Found.*, 594 U.S. at 608, and the Court should issue a protective order preventing disclosure of documents responsive to these requests. *Perry*, 591 F.3d at 1145. Nor can LCMS demonstrate a "substantial need" to overcome any work-product privilege. Fed. R. Civ. P. 26(b)(3). The Court should therefore issue a protective order for attorney-client and work-product privileged documents responsive to these requests. Fed. R. Civ. P. 26(c)(1)(A)&(D).

21.     <u>Group 2: Seating Regents.</u> Several requests seek communications between Regents, President Christian, and/or Provost Kirk regarding the seating of Regents following the passage of

the amendments. *See* **Exs. 3-5**, Ex. A, Nos. 12-15, 36-39, 41& 51. First Amendment protections for Freedom of Religion include "the right of religious organizations to select their own leaders." *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25 (1976). This right, called the 'ministerial exception,' "is not limited to the head of a religious congregation." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190, 132 S. Ct. 694, 707 (2012). There is no bright line test for which employees qualify for the ministerial exception, but it can include those who spread the message and carry out the mission of the organization, *see Id.* at 708, and those in leadership positions of the organization. *Cannata*, 700 F.3d at 175 (citing *Hosana-Tabor*, 565 U.S. at 199 (S. Alito concurring).

22.     CTX's Regents must be members of Lutheran Congregations who desire to serve CTX's mission, who attract others to Christ through Christ-like conduct, and exemplify a lifestyle that the Christian Community expects of its leaders. **Ex. 2** at ¶ 2; **Ex. 10** at ¶ 3. Thirty percent of the Regents must be ordained Lutheran ministers or commissioned members of the LCMS. *Id*. The Regents undergo an in-depth interview with the Board's nomination committee and Board Chair prior to appointment. **Ex. 10** at 4. Regents also undergo orientation and training, including training in CTX's Standards of Lutheran Identity and are responsible for creating University policy to ensure CTX meets its standard in regard to Christian ethics and prudence. **Ex. 10** at  4; **Ex. 2** at ¶ 2. Their selection by CTX is a protected First Amendment right, *see Hosanna-Tabor*, 565 U.S. at 190, and the use of the Court's subpoena power to invade the process of that selection is an incursion into that right and violates RFRA. *See e.g. Whole Woman's Health*, 896 F.3d at 371-73. The threat of reprisals, and diminished use of electronic communications by CTX's Regents and Officers if CTX's former Regents were compelled to produce such documents and

communications impacts the ability of CTX's leadership team to engage in timely and free communications regarding important governance matters. **Ex. 1** at ¶¶ 10-11; **Ex. 2** at ¶¶ 6-7. This is an incursion into CTX and its leaderships' freedom to associate. *Id*. at 374; *see also AFL-CIO*, 333 F.3d at 177-78; *Perry*, 591 F.3d at 1142. Moreover, CTX's attorneys have counseled the Regents and Officers regarding Board governance, which includes the seating of Regents. **Ex. 1** at ¶ 13.

23.      LCMS cannot demonstrate a substantial need for or sufficient interest in the subpoenaed documents regarding the seating of CTX Regents to overcome these privileges. This lawsuit is about CTX's amendments to its governing documents and whether it had authority to carry out those amendments. **Complaint** at ¶¶ 48-81. There is no dispute that after amending its bylaws, CTX refused to seat Regents selected by Synod, and instead sat Regents selected by the CTX Board. *See e.g.* **Complaint** at ¶ 38 and Ex. O. Probing into the processes by which CTX's governing body selected regents is therefore unnecessary to establish the fact of CTX's actions. Therefore, LCMS cannot satisfy the "exacting scrutiny" for compelled disclosure of documents that would chill CTX's First Amendment rights, *see e.g. Ams. for Prosperity Found.*, 594 U.S. at 608, and the Court should issue a protective order preventing disclosure of documents responsive to these requests. *Perry*, 591 F.3d at 1145. Nor can LCMS demonstrate the necessary "substantial need" to overcome any work product privilege. Fed. R. Civ. P. 26(b)(3). The Court should therefore issue a protective order for attorney-client and work-product privileged documents responsive to these requests. Fed. R. Civ. P. 26(c)(1)(A)&(D).

24.      Group 3: CTX's Donors. Two requests seek communications with CTX's donors. *See* **Exs. 3-5**, Ex. A, Nos. 16 & 40. Disclosure of donor identification is an intrusion into First Amendment rights of association that triggers exacting scrutiny of the demanded disclosure and a sufficiently

important government interest to override the 1st Amendment protection. *See Ams. for Prosperity Found.*, 594 U.S. at 615-619. CTX does not believe that the content of communications with CTX's donors is protected by the First Amendment, only the identifying information of CTX's donors. LCMS cannot identify a sufficiently compelling interest in CTX's donor information to warrant an incursion into CTX's donors' freedom of association. Therefore, the Court should issue a protective order preventing disclosure of donor identities in documents responsive to these requests. *Perry*, 591 F.3d at 1145.

25.    <u>Group 4: CTX's Relationship with Synod & LCMS</u>. Several requests seek documents regarding CTX's and its leadership's thoughts and opinions regarding CTX's relationship with Synod and LCMS. *See* **Exs. 3-5**, Ex. A. This includes requests for documents and communications regarding the passage of resolutions by Synod in convention which: a) addressed the relationship between Synod and Concordia Universities; b) called CTX's leadership to repentance; and c) sought to enhance supervision over Synod controlled universities. *Id*. at Nos. 42, and 47-49. LCMS also seeks communications between CTX's Regents and/or its Officers regarding alternative relationship structures to Synod considered by CTX and communications and documents regarding the withdrawal of CTX from LCMS's insurance funds. *Id*. at Nos. 50 & 55.

26.    Compelled disclosure of documents and communications among CTX's Officers and Regents regarding Synod resolutions, and CTX's relationship with Synod infringes on CTX's and its leaderships' 1st Amendment Freedom of Religion and Association, and violates RFRA, by probing the process of internal governance and its ecclesiastical relationship with LCMS and Synod. *Whole Woman's Health* at 371-374; *see also AFL-CIO*, 333 F.3d at 177-78; *Perry*, 591 F.3d at 1142; *see also* **Exs.** 8-9. LCMS does not have sufficient interest to override these First Amendment privileges as the sought-after documents are unnecessary to the resolution of this case.

Therefore, the Court should issue a protective order preventing disclosure of documents responsive to these requests. *Perry*, 591 F.3d at 1145.

27.     In addition, CTX's attorneys advised CTX's leadership regarding the effect of the Synod resolutions, the proposed relationship changes with LCMS and Synod, and the withdrawal of CTX from LCMS's retirement and insurance plans. **Ex. 1** at ¶ 13. Communications and documents containing this advice is protected by CTX's attorney-client privilege. *Rush*, 2000 U.S. App. LEXIS 39647, at *6. Any documents prepared by CTX's representatives or attorneys in anticipation of this litigation, which is about whether Synod or CTX's Board controls CTX, is protected under CTX's work-product privilege. Fed. R. Civ. P. 26(b)(3). The Court should therefore issue a protective order for attorney-client and work-product privileged documents responsive to these requests. Fed. R. Civ. P. 26(c)(1)(A)&(D).

28.     <u>Group 5: Lutheran Identity Statement</u>. LCMS has also requested "a copy of each draft of the Lutheran Identity Statement." **Exs. 3-5**, Ex. A, No. 46. The Demonstration of Lutheran Identity Statement is "a document that provides a framework by which CTX will live out and demonstrate faithfulness to its Lutheran Identity." **Ex. 2** at ¶ 9. It was prepared by the Board of Regents and contains the religious polity of CTX. *Id*. Compelled disclosure of drafts of this statement is a violation of CTX's right to decide matters of church faith free from State interference. *See e.g. Kedroff*, 344 U.S. at 116; *see also Whole Women's Health*, 896 F.3d at 371-72. It also violates RFRA. *see Whole Women's Health*, 896 F.3d at 371. Moreover, disclosure of drafts of CTX's religious polity will likely result in a chilling of the free flow of discussion by CTX's leadership. *See* **Ex. 1**, ¶ 10-11; **Ex. 2**, ¶ 6-7. LCMS does not have sufficient interest to override CTX and its leaderships' First Amendment privileges as the sought-after documents are completely irrelevant

to the resolution of this case. Therefore, the Court should issue a protective order preventing disclosure of documents responsive to this request. *Perry*, 591 F.3d at 1145.

29.     <u>Group 6: CTX's President</u>. Several requests seek information regarding CTX's President including communications between Regents and/or CTX's Officers regarding presidential succession plans, the presidential search process, qualifications of a future president, and the current President's salary. **Exs. 3-5**, Ex. A, Nos. 52-54 & 57. CTX's President must "be a member in good-standing of an LCMS congregation, understand and articulate the theology, history, and practice of the Lutheran Church-Missouri Synod, especially in its relation to higher education, and commit to and affirm their support of Article II of the LCMS Constitution." **Ex. 10** at 6. CTX's President leads chapel at the University, leads students and staff in prayer, reports to the Board on alignment of the University with the LCMS, and ensures the Lutheran identity is carried throughout the campus. **Ex. 1** at ¶ 3.

30.     The selection of CTX's President is a protected First Amendment right, *see Hosanna-Tabor*, 565 U.S. at 190, and the use of the Court's subpoena power to invade the process of that selection is an incursion into that right and a violation of RFRA. *See e.g. Whole Woman's Health*, 896 F.3d at 371-73. The threat of reprisals, and diminished use of electronic communications resulting from compelled production of such documents impacts the ability of CTX's leadership team to engage in timely and free communications regarding important governance matters, such as the selection of its President. **Ex. 1** at ¶¶ 10-11; **Ex. 2** at ¶¶ 6-7. Compelled disclosure of internal communications regarding the selection and qualifications of CTX's President is an incursion into CTX and its leaderships' freedom to associate. *Id*. at 374; *see also AFL-CIO*, 333 F.3d at 177-78; *Perry*, 591 F.3d at 1142. LCMS itself recognizes that internal documents and communications regarding the selection of religious university's president is privileged under the 1st Amendment.

*See e.g.* **Ex. 8** at 9-11; **Ex. 9** at 19-21; *see also Hotchalk, Inc.*, 2022 Ore. Cir. LEXIS 5513 at *1-6 (Granting LCMS a protective order regarding internal communications as to who should be a Concordia University President). LCMS does not have a sufficient interest to overcome these privileges as neither the selection process of CTX's future president, nor the development of qualifications for CTX's president, have any bearing on the outcome of this suit. Therefore, the Court should issue a protective order preventing disclosure of documents responsive to these requests. *Perry*, 591 F.3d at 1145.

31.     <u>Group 7: CTX's Finances.</u> LCMS asked former Regents to produce documents or communications showing the impact of this lawsuit on CTX's finances and CTX's acquisition of debt from Frost Bank. **Exs. 3-5**, Ex. A, Nos. 56 & 58. The ability of religious schools "to make decisions concerning the recruitment, allocation and expenditure of their funds is intimately bound up in their mission of religious education and thus is protected by the free exercise clause of the First Amendment." *Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979). The compelled disclosure of such information intrudes "upon decisions of religious authorities as to how much money should be expended and how funds should best be allotted to serve the religious goals of the school." *Id*. at 79. This information is thus protected from compelled disclosure in discovery by First Amendment privileges and RFRA. *See e.g. Whole Woman's Health*, 896 F.3d at 371-73. LCMS does not have sufficient interest to override CTX's First Amendment privileges as information regarding the impact of this litigation on CTX's finances or the acquisition of debt by CTX from Frost Bank is irrelevant to the resolution of this case. Therefore, the Court should issue a protective order preventing disclosure of documents responsive to these requests. *Perry*, 591 F.3d at 1145.

32.    Moreover, CTX's lawyers prepared and reviewed documents and provided advice to CTX's leadership regarding the acquisition of debt from Frost Bank. **Ex. 2** at ¶ 10. Any documents or communications containing their advice are protected under CTX's attorney-client privilege, as are any communications and documents concerning advice on the financing of this suit and its impact on the institution. *Rush*, 2000 U.S. App. LEXIS 39647, at *6. Finally, any documents prepared by CTX's attorneys and/or representatives regarding the impact of this litigation on CTX's finances in preparation for this litigation are protected by work-product privileges. Fed. R. Civ. P. 26(b)(3). The Court should therefore issue a protective order for attorney-client and work-product privileged documents responsive to these requests. Fed. R. Civ. P. 26(c)(1)(A)&(D).

33.    <u>Group 8: Broad Requests related to the CTX Board</u>. Finally, LCMS seeks all notes and recordings from "all CTX Board of Regents meetings from January 2000 to date," all communications between Board of Regents members since January 2000 and all Board Minority Reports since 2020. **Exs. 3-5**, Ex. A, Nos. 1-2, 7, & 19. All of these requests are seeking information regarding the internal governance of CTX, which is protected under the 1st Amendment privileges of freedom of religion and freedom of association, and RFRA. *Whole Woman's Health,* 896 F.3d at 371-374; *see also AFL-CIO*, 333 F.3d at 177-78; *Perry*, 591 F.3d at 1142. Three of the four requests are seeking documents spanning more than two decades. **Exs. 3-5**, Ex. A, Nos. 1-2, & 19. Yet, the events giving rise to this litigation only began in late November of 2022. *See* **Complaint**. The more modest request still seeks documents two years before the events giving rise to these proceedings. **Exs. 3-5**, Ex. A, No. 7. There is no limit on the subject matter in any of these requests and nothing to demonstrate the relevance of these broad requests to these proceedings. Therefore, LCMS cannot possibly demonstrate a sufficient interest to

overcome the 1st Amendment privileges of religion and association and the Court should issue a protective order as to these requests. *Perry*, 591 F.3d at 1145.

34.     Moreover, CTX's attorneys are occasionally present at Board meetings to provide legal advice to CTX regarding any number of issues. **Ex. 2** at ¶ 4; *see also e.g.* **Ex. 1** at ¶¶ 7-9. Any documents, communications, or notes created by or exchanged between CTX's representatives which contain this advice is protected under CTX's attorney-client privilege. *Rush*, 2000 U.S. App. LEXIS 39647, at *6. And, since CTX was aware that litigation would likely ensue as early as February of 2022, any documents prepared by CTX's representatives or attorneys in anticipation of this litigation is protected under CTX's work-product privilege. Fed. R. Civ. P. 26(b)(3). The Court should therefore issue a protective order for attorney-client and work-product privileged documents responsive to these requests. Fed. R. Civ. P. 26(c)(1)(A)&(D).

### a. *Ex-parte* Communications

35.     <u>*Ex parte* communications with former leadership should not seek out privileged information</u>. Although there is no ethical prohibition on *ex parte* communications with former leaders or employees of corporations, *see e.g.* Tex. Disc. R. Prof. Cond. 4.02, "courts have consistently enforced a prohibition against *ex parte* communications with former employees of adverse corporate parties where the contacts involve privileged or confidential information." *Bryant v. Yorktowne Cabinetry, Inc.*, 538 F. Supp. 2d 948, 949 (W.D. Va. 2008). Where corporate parties identify "specific privileged information to which the former employee was privy might be placed in jeopardy by the *ex parte* contact" a narrowly tailored protective order is appropriate. *Butler v. Exxon Mobil Ref. & Supply Co.*, No. 07-386-C-M2, 2008 U.S. Dist. LEXIS 145139, at *11 (M.D. La. 2008); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 629 (S.D.N.Y. 1990).

36.    <u>The subpoenaed former Regents are privy to privileged information that is threatened by ex parte contact.</u> Nathan Hill, Tom Zachman, Alan Taylor, and Jim Cleary were members of the Board during the November 8, 2022 Board Meeting where the Board sought the advice of its attorneys regarding amending CTX's governing documents. *See* **Ex. 1** at ¶¶ 6 & 8. Alan Taylor, and Jim Cleary were present at the April 4, 2023 Board Meeting where the Board sought the advice of its attorneys regarding affirming the decision to amend CTX's governing documents. *See* **Ex. 1** at ¶ 8. As Regents, they received advice from, as well as documents and communications which included the advice of, CTX's attorneys on a variety of topics including debt acquisition, property sales, and other governance matters. *See* **Ex. 1** at ¶¶ 7-9, 13. This legal advice, which was communicated to the former Regents as representatives of CTX, is protected by CTX's attorney-client privilege. *Rush*, 2000 U.S. App. LEXIS 39647, at \*6.

37.    Similarly, during their positions as Regents, Hill, Zachman, Taylor, and Cleary, participated in communications regarding the governance and religious polity of CTX during their participation in Board meetings. *See* **Ex. 1** at ¶¶ 7-9, 13; **Ex. 2** at ¶ 3. This information is protected by CTX's and its leaderships' First Amendment privileges of freedom of religion and freedom of association. *See e.g. Whole Woman's Health*, 896 F.3d at 371-74.

38.    <u>A protective order is appropriate</u>. As CTX has not waived these privileges, the Court should issue a protective order prohibiting *ex parte* communications between LCMS and CTX's former Regents regarding any privileged information obtained in the course of the former Regents' positions on the Board. *See Butler*, 2008 U.S. Dist. LEXIS 145139, at \*11.

## V.    PRAYER

LCMS is seeking privileged information through third-party subpoenas of CTX's former leadership. CTX respectfully requests the Court issue a protective order forbidding the disclosure

or discovery" and inquiry into these privileged communications and documents, and any further relief CTX may be entitled.

Respectfully submitted,

*/s/ Daniel R. Richards*
**Daniel R. Richards**
State Bar No. 00791520
drichards@rrsfirm.com
**Clark Richards**
State Bar No. 90001613
crichards@rrsfirm.com
**Albert A. Carrion, Jr.**
State Bar No. 03883100
acarrion@rrsfirm.com
**RICHARDS RODRIGUEZ & SKEITH, LLP**
611 West 15th Street
Austin, Texas 78701
Telephone: (512) 476-0005

***Attorneys For Defendants***
***Concordia University Texas, Inc.,***
***Donald Christian and Christopher Bannwolf***

## CERTIFICATE OF CONFERENCE

I certify that on September 3, 2024, I conferred with counsel for Plaintiff about the relief being sought in this motion and on September 9, 2024, Plaintiff's counsel indicated that he does oppose this motion.

*/s/ Daniel R. Richards*
**DANIEL R. RICHARDS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of September 2024, I electronically filed the above and foregoing document, which will send notification of such filing to:

Steven C. Levatino
Levatino & Pace PLLC
1101 S. Capital of Texas Hwy.
Bldg. K, Suite 125
Austin, Texas 78746
steven@lpfirm.com

Andrew F. MacRae
MacRae Law Firm PLLC
3267 Bee Cave Road
Suite 107, PMB 276
Austin, Texas 78746
andrew@macraelaw.co

Gregg R. Kronenberger
Kronenberger Law Firm, PLLC
1101 S. Capital of Texas Hwy.
Bldg. K, Suite 125
Austin, Texas 78746
gregg@gkronenberger.com

*/s/ Daniel R. Richards*
**DANIEL R. RICHARDS**