1
2
3
4
5
6
7          IN THE CIRCUIT COURT OF THE STATE OF OREGON
8                 FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| HOTCHALK, INC., | No.: 20CV15620 |
| Plaintiff, | DEFENDANT THE LUTHERAN CHURCH—MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER |
| v. | |
| LUTHERAN CHURCH-MISSOURI SYNOD; LUTHERAN CHURCH EXTENSION FUND; CONCORDIA UNIVERSITY SYSTEM; CONCORDIA UNIVERSITY, ST. PAUL; CONCORDIA UNIVERSITY (aka CONCORDIA UNIVERSITY-PORTLAND); CONCORDIA FOUNDATION; CHARLES E. GERKEN; KATHLEEN HONE; TERRY WILSON; JERRY BALTZELL; DAVID O. BERGER; MICHAEL BORG; DR. CHARLES E. BRONDOS; GERALD KOLL; REV. PAUL LINNEMANN; JEFF OLTMANN; REV. KURT ONKEN; REV. TIMOTHY PAULS; BEV PELOQUIN; DR. ROD WEGENER; REV. SAM WISEMAN; BRIAN T. YAMABE; REV. THOMAS JOHN ZELT; THOMAS RIES; CHRIS DUNNAVILLE: GEORGE THURSTON; and RICHARD DOUGHTY, | ORAL ARGUMENT REQUESTED (Hon. Eric L. Dahlin) |
| Defendants. | |

DEFENDANT THE LUTHERAN CHURCH—MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR
PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................. 1

II. ARGUMENT ...................................................................... 2

    A. Plaintiff's claims against LCMS are based on the theory that LCMS is liable for actions it took with respect to an affiliated entity—CUP—in furtherance of LCMS's religious faith and beliefs. ... 2

    B. The First Amendment's protections for church autonomy and freedom of association preclude Plaintiff from probing LCMS's private internal communications concerning matters of church faith and beliefs. ............... 4

        1. The Free Exercise Clause and the Establishment Clause combine to provide the basis for the church-autonomy doctrine, which prevents civil courts from examining a religious organization's faith-based actions. ............................................................ 4

        2. The First Amendment right to freedom of association protects an organization's right to communicate without fear of its private internal communications being disclosed. ....................... 7

        3. The opinions in *Whole Woman's Health* and *Perry* illustrate the analysis required when evaluating a claim of First Amendment privilege against discovery in civil litigation. ..................... 8

            (a) *Whole Woman's Health v. Smith*, 896 F3d 362 (5th Cir 2018), *cert den*, 139 S Ct 1170 (2019). ............................ 8

            (b) *Perry v. Schwarzenegger*, 591 F3d 1147 (9th Cir 2010). ..10

        4. Plaintiff has not demonstrated its desire to probe LCMS's private internal communications outweighs LCMS's First Amendment protections. ................................................... 12

            (a) LCMS does not argue either that religious organizations may not be sued or that religious organizations are exempt from discovery. ......................................................... 14

            (b) LCMS does not argue that every infringement on religious rights is unconstitutional. .................................... 15

            (c) The church-autonomy doctrine arises from both Religion Clauses. ........................................................ 16

            (d) Plaintiff's fraud allegations do not eviscerate the church-autonomy doctrine and LCMS's right to free association. . 17

            (e) The neutral laws doctrine does not justify intrusion into church autonomy. ............................................. 18

            (f) Plaintiff does not need discovery to determine whether the president of CUP fits within the ministerial exception. ..... 19

    C. LCMS has not waived its right to argue that allowing discovery into LCMS's private internal communications regarding its faith and religious principles would violate the First Amendment's protections for church autonomy and the freedom of association. ............................... 21

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1. The LCMS's First Amendment rights are not equivalent to any statutory or common law privilege. .................................................. 21

2. LCMS has consistently asserted its First Amendment rights. ....... 23

3. Subject-matter waiver does not apply to First Amendment rights. 25

4. The production of the documents cited by Plaintiff has not resulted in waiver of LCMS's First Amendment rights. ............................ 27

5. Production of documents by any other defendant cannot waive LCMS's First Amendment rights. .................................................. 28

6. Public statements cannot waive the LCMS's First Amendment rights. ........................................................................................... 28

III. CONCLUSION .................................................................................. 29

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Bollard v. California Province of the Soc'y of Jesus*,
    196 F3d 940 (9th Cir 1999)....................................................................5, 15

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F3d 648 (10th Cir 2002)....................................................................6, 13

*Christofferson v. Church of Scientology of Portland*,
    57 Or App 203, 644 P2d 577, *rev den*, 293 Or 456 (1982),
    *cert den*, 459 US 1206, 1227 (1983) ......................................................17

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day
    Saints v. Amos*,
    483 US 327, 107 S Ct 2862, 97 L Ed 2d 273 (1987).......................................10

*Demkovich v. St. Andrew the Apostle Parish, Calumet City*,
    3 F4th 968 (7th Cir 2021) (en banc) ...........................................5, 6, 7, 19, 20

*Diocese of Lubbock (In Re)*,
    624 SW3d 506 (Tex 2021)........................................................................29

*Duplan Corp. v. Deering Milliken, Inc.*,
    540 F2d 1215 (4th Cir 1976)....................................................................26

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990)...................................19

*Fearing v. Bucher*,
    328 Or 367, 977 P2d 1163 (1999)..............................................................14

*Fulton v. City of Philadelphia, Pennsylvania*,
    141 S Ct 1868 (2021) ..............................................................................18

*Guthrey v. California Dept. of Corrections and Rehabilitation*,
    No. 1:10-cv-02177-AWI-BAM, 2012 WL 2499938
    (ED Cal June 27, 2012)...........................................................................12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 US 171, 132 S Ct 694, 181 L Ed 2d 650 (2012)....................................6, 7, 19, 20

*Huntsman v. Corp. of Pres. Of Church of Jesus Christ of Latter-Day Saints*,
    No. 2:21-cv-02504, 2021 WL 4296208 (September 10, 2021) .........................16

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Page(s)

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31,*
138 S Ct 2448, 201 L Ed 2d 924 (2018) ...............................................................22

*Jeong v. Cal. Pacific Ann. Conf.,*
No. 92-55370, 1992 WL 332160 (9th Cir 1992) ....................................................17

*Johnson v. Zerbst,*
304 US 458, 58 S Ct 1019, 82 L Ed 2d 1461 (1938) ...........................................22

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
344 US 94, 73 S Ct 143, 97 L Ed 120 (1952) .........................................................6

*K.F. v. Baker Sch. Dist. 5J,*
2021 WL 863198 (D Or 2021) ...............................................................................25

*Korte v. Sebelius,*
735 F3d 654 (7th Cir 2013), *cert den*, 573 US 958 (2014)..............................6, 16

*Larkin v. Grendel's Den, Inc.,*
459 US 116, 103 S Ct 505, 74 L Ed 2d 297 (1982) ............................................22

*Lemon v. Kurtzman,*
403 US 602, 91 S Ct 2105, 29 L Ed 2d 745 (1971) ..............................................5

*Marisol v. Giuliani,*
No. 95 Civ. 10533(RJW), 1998 WL 1328107 (SDNY March 23, 1998) .................26

*Meyer v. State by & through Oregon Lottery,*
292 Or App 647, 426 P3d 89 (2018)................................................................26, 27

*Minker v. Balt. Ann. Conf. of United Methodist Church,*
894 F2d 1354 (DC Cir 1990) ................................................................................14

*M.K. v. Archdiocese of Portland,*
228 F Supp 2d 1168 (D Or 2002) .........................................................................16

*Mobil Oil v. United States EPA,*
879 F2d 698 (9th Cir 1989)...................................................................................26

*Motor Fuel Temperature Sales Practices Litig. (In Re),*
641 F3d 470 (10th Cir 2011)...................................................................................8

*NAACP v. State of Ala. ex rel. Patterson,*
357 US 449, 78 S Ct 1163, 2 L Ed 2d 1488 (1958) ..............................................8

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

**Page(s)**

*Newport Church of Nazarene v. Hensley,*
    335 Or 1, 56 P3d 386 (2002)..................................................15, 16, 19

*Ostlund v. Bobb,*
    825 F2d 1371 (9th Cir 1987)..................................................22

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S Ct 2049 (2020) ..................................1, 5, 7, 14, 16, 20

*Perry v. Schwarzenegger,*
    591 F3d 1147 (9th Cir 2010)..................................1, 8, 10, 11, 12, 13

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
    772 F2d 1164 (4th Cir 1985).................................................4

*Roman Catholic Archbishop of Portland in Oregon (In Re),*
    335 BR 815 (D Or 2005)...................................................18

*Schneckloth v. Bustamonte,*
    412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973)........................28

*Sealed Cases (In Re),*
    121 F3d 729 (DC Cir 1997)................................................26

*Serbian E. Orthodox Diocese v. Milivojevich,*
    426 US 696, 96 S Ct 2372, 49 L Ed 2d 151 (1976)........................5

*State v. Carlson,*
    225 Or App 9, 199 P3d 885 (2008)........................................23

*State v. Sawyer,*
    221 Or App 350, 354, 190 P3d 409 (2008)................................23

*United States v. Berger,*
    473 F3d 1080 (9th Cir 2007)..........................................26, 27

*United States v. Lee,*
    455 US 242, 102 S Ct 1051, 71 L Ed 2d 127 (1982)......................15

*United States v. Sanmina Corp.,*
    968 F3d 1107 (9th Cir 2020)...............................................25

*Walls v. Cent. Contra Costa Transit Auth.,*
    653 F3d 963 (9th Cir 2011)................................................22

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

**Page(s)**

*Watson v. Jones*,
    80 US (13 Wall.) 679, 20 L Ed 666 (1871) .......................................................... 6

*Whole Woman's Health v. Smith*,
    896 F3d 362 (5th Cir 2018), *cert den*, 139 S Ct 1170 (2019) ............................ 8, 9, 10, 12

**RULES**

Fed. R. Civ. P. 45(d) ................................................................................................ 9

**CONSTITUTIONS**

United States Constitution First Amendment ........................................................ 4

**OTHER AUTHORITIES**

Epstein, Edna Selan, *The Attorney–Client Privilege and the Work–Product*
    *Doctrine*, 3d ed, Section of Litigation, American Bar Association (1997) .................... 26

Laycock, Douglas, *Towards a General Theory of the Religion Clauses: The*
    *Case of Church Labor Relations and the Right to Church Autonomy*,
    81 COLUM. L. REV. 1373 (1981) ...................................................................... 6

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204–4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

## I. INTRODUCTION

The Religion Clauses of the First Amendment to the United States Constitution give rise to the church-autonomy doctrine. The church-autonomy doctrine protects the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S Ct 2049, 2060, 207 L Ed 2d 870 (2020).

The First Amendment also ensures the right of free association. That right includes the right to be free from forced disclosures of private internal communications that would chill full and frank discussions among association members. *Perry v. Schwarzenegger*, 591 F3d 1147, 1163 (9th Cir 2010).

In this lawsuit, Plaintiff seeks discovery of the Lutheran Church—Missouri Synod's (LCMS) private internal communications regarding the tenets of its faith and how to foster and apply its faith. The protections guaranteed by the First Amendment's Religion Clauses and right of free association preclude Plaintiff's efforts to invade LCMS's deliberations regarding matters of profound doctrinal concern.

To be clear, and contrary to Plaintiff's arguments, LCMS does not contend it has no obligation to provide discovery. To the contrary, LCMS has produced more than 20,000 pages of documents. LCMS merely asserts that not all of its private internal communications are subject to discovery; instead, it opposes discovery of its private internal communications based on its well-established right to be free to address ecclesiastical questions free from compelled disclosure in the context of civil litigation. The First Amendment bars such intrusions.

Accordingly, this court should grant LCMS's motion for a protective order against Plaintiff's invasive discovery requests.

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

## II.  ARGUMENT

A.    **Plaintiff's claims against LCMS are based on the theory that LCMS is liable for actions it took with respect to an affiliated entity—CUP—in furtherance of LCMS's religious faith and beliefs.**

This case arises from the April 2020 closure of Concordia University—Portland (CUP). CUP's closure allegedly caused Plaintiff more than $302 million in economic losses. (Second Amended Complaint, pp. 64-66.)[1]

Plaintiff alleges LCMS is one of numerous entities and individuals liable for Plaintiff's losses. The Second Amended Complaint alleges counts against LCMS on each of the following legal theories: (1) fraud (Sec. Am. Com. ¶¶ 114-123); (2) intentional fraudulent transfer (Sec. Am. Com. ¶¶ 124-32); (3) constructive fraudulent transfer (Sec. Am. Com. ¶¶ 135-37); (4) breach of fiduciary duty derivatively on behalf of CUP (Sec. Am. Comp. ¶ 140); (5) direct claim for breach of fiduciary duty (Sec. Am. Com. ¶ 141); (6) breach of the duty of good faith and fair dealing (Sec. Am. Com. ¶¶ 148-51); (7) unjust enrichment (Sec. Am. Com. ¶¶ 152-56); (8) alter ego and veil piercing (Sec. Am. Com. ¶¶ 157-76); (9) breach of contract—termination fee (Sec. Am. Com. ¶¶ 177-81); (10) intentional interference with contractual relations (Sec. Am. Com. ¶¶ 182-88); and (11) injunction (Sec. Am. Com. ¶¶ 193-200).

Although Plaintiff alleges a disparate constellation of legal theories, a common thread connects each of the 11 counts against LCMS: Plaintiff contends LCMS orchestrated CUP's financial collapse because of CUP's refusal to adhere to the tenets, doctrines, and beliefs of LCMS's faith, particularly through CUP's tolerance for, and support of, CUP's Gender and Sexuality Resource Center.

Plaintiff's theory, and its focus on LCMS's tenets regarding homosexuality, goes like this:

---

[1] The Second Amended Complaint (filed November 5, 2021) is the operative complaint.

Bullivant|Houser|Bailey PC

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1. CUP went out of business because it lacked the funds necessary to remain open.

2. CUP's financial distress resulted from LCMS forcing CUP's president (Schlimpert) to resign (Sec. Am. Com. ¶¶ 54-56), then refusing to allow CUP to appoint a new permanent president. (Sec. Am. Com. ¶¶ 59-63, 172.) According to Plaintiff, LCMS's refusal to allow CUP to appoint a new permanent president adversely affected CUP's ability to raise funds for its operations. (Sec. Am. Com. ¶ 187.)

3. CUP's financial distress also resulted from LCMS allegedly refusing to extend or approve funding to CUP. (Sec. Am. Com. ¶¶ 119, 121, 172, 176.)

4. LCMS's actions (i.e., allegedly blocking a replacement president and refusing to extend or approve funding) were done to "punish" CUP for refusing to comply with LCMS's religious beliefs through CUP's refusal to adhere to LCMS's directions to prohibit the Gender and Sexuality Resource Center. (Sec. Am. Com. ¶ 172.) Paragraph 53 of the Second Amended Complaint lays out Plaintiff's view of the controversy regarding the Gender and Sexuality Resource Center:

> Concordia's ongoing financial problems were contemporaneous with disputes between Concordia's local leadership and Concordia's parent entities, the Synod and the Concordia System. Over a period of several years, both the Synod and Concordia System objected to, and took actions against, Concordia for what the Synod and Concordia System considered to be Concordia's "gay advocacy" and "non-compliance" with Synod doctrine and practices. The Synod and the Concordia System expressed particular concern about Concordia's Gender and Sexuality Resource Center. For example, on July 15, 2015, Synod President Matthew Harrison wrote to all of the Concordia System Presidents, criticizing Concordia President Charles Schlimpert's decision to permit a Pride Club on Concordia's campus. Citing the fall of Adam, Synod President Harrison compared Concordia's club to a "Hook-Up club dedicated to promiscuity." President Harrison's letter further stated that no advocacy for "immoral behavior – against Scripture and [Synod] teaching" should be permitted.

Thus, LCMS's religious beliefs, and the actions LCMS allegedly took in furtherance

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE    Document 39-9    Filed 09/16/24    Page 11 of 39
**Exhibit 9 to CTX Motion for Protective Order**
**Page 11 of 39**

of those beliefs, are at the core of Plaintiff's claims against LCMS. According to Plaintiff's allegations, LCMS's actions were motivated solely by its adherence to the beliefs of its religion and its desire to bring CUP into compliance with those beliefs.

Notably, Plaintiff does not argue that LCMS's alleged actions were not motivated by sincerely held religious beliefs. In some cases that is an issue—here, it is not.

Because Plaintiff's claims directly implicate LCMS's religious tenets and the actions LCMS allegedly took in furtherance of those tenets, LCMS has moved for a protective order to prevent Plaintiff from pursuing discovery "designed to probe the mind of the church[.]" *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F2d 1164, 1171 (4th Cir 1985), *cert den*, 478 US 1020 (1986) (describing the impermissible entanglement of church and state that can arise from allowing discovery into a religious organization's personnel decisions).

## B. The First Amendment's protections for church autonomy and freedom of association preclude Plaintiff from probing LCMS's private internal communications concerning matters of church faith and beliefs.

LCMS's motion for a protective order is based on two doctrines emanating from the First Amendment to the United States Constitution:[2] (1) the right to church autonomy, and (2) the right to freedom of association.

### 1. The Free Exercise Clause and the Establishment Clause combine to provide the basis for the church-autonomy doctrine, which prevents civil courts from examining a religious organization's faith-based actions.

The First Amendment has two clauses concerned with religious freedoms. The Free Exercise Clause provides "Congress shall make no law * * * prohibiting the free exercise [of

---

[2] The First Amendment states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the Government for a redress of grievances."

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

religion.]" "The Free Exercise Clause restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs." *Bollard v. California Province of the Soc'y of Jesus*, 196 F3d 940, 945 (9th Cir 1999).

The Establishment Clause provides that "Congress shall make no law respecting establishment of religion * * *." The Establishment Clause was directed at "three main evils": sponsorship, financial support, and active involvement of the sovereign in religious activity. *Lemon v. Kurtzman*, 403 US 602, 612, 91 S Ct 2105, 29 L Ed 2d 745 (1971).

The First Amendment's Religion Clauses, and the United States Supreme Court's cases interpreting them, have given rise to "the doctrine of 'church autonomy.'" *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F4th 968, 975 (7th Cir 2021) (en banc). "This well-established principle means what it says: churches must have 'independence in matters of faith and doctrine in closely linked matters of internal government.'" *Id.* (quoting *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S Ct 2049, 2061, 207 L Ed 2d 870 (2020)). The church-autonomy doctrine prevents civil courts from "becom[ing] entangled in essentially religious controversies[.]" *Serbian E. Orthodox Diocese v. Milivojevich*, 426 US 696, 709, 96 S Ct 2372, 49 L Ed 2d 151 (1976).

As the United States Supreme Court explained in *Our Lady of Guadalupe*:

> Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusions.

*Id.* at 2060 (cleaned up).

"The church-autonomy doctrine respects the authority of churches to 'select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions'

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE    Document 39-9    Filed 09/16/24    Page 13 of 39
Exhibit 9 to CTX Motion for Protective Order
Page 13 of 39

1  free from governmental interference." *Korte v. Sebelius*, 735 F3d 654, 677 (7th Cir 2013),

2  *cert den*, 573 US 958 (2014) (quoting Douglas Laycock, *Towards a General Theory of the*

3  *Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*,

4  81 COLUM. L. REV. 1373, 1389 (1981)).

5      The church-autonomy doctrine finds support not only in the First Amendment's

6  Religion Clauses, but also in "a long line of Supreme Court cases that affirm the fundamental

7  right of churches to decide for themselves, free from state interference, matters of church

8  government as well as those of faith and doctrine." *Bryce v. Episcopal Church in the Diocese*

9  *of Colorado*, 289 F3d 648, 655 (10th Cir 2002) (cleaned up). The church-autonomy cases

10 began with *Watson v. Jones*, 80 US (13 Wall.) 679, 20 L Ed 666 (1871), where the court

11 declined to intervene in a property dispute between two factions of a church. The United

12 States Supreme Court later described *Watson* as an "opinion [that] radiates * * * a spirit of

13 freedom for religious organizations, an independence from secular control or manipulation,

14 in short, power to decide for themselves, free from state interference, matters of church

15 government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of*

16 *Russian Orthodox Church in N. Am.*, 344 US 94, 116, 73 S Ct 143, 97 L Ed 120 (1952).

17      *Watson*, *Kedroff*, and the United States Supreme Court's other Religion Clause cases,

18 giving rise to the church-autonomy doctrine, "teach[] that avoidance, rather than

19 intervention, should be a court's proper role when adjudicating disputes involving religious

20 governance." *Demkovich*, 3 F4th at 975.

21      The ministerial exception is a specific application of the church-autonomy doctrine.

22 The ministerial exception was recognized by the United States Supreme Court in *Hosanna-*

23 *Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 US 171, 188, 132 S Ct 694,

24 181 L Ed 2d 650 (2012). The ministerial exception provides that a religious organization

25 may not be held liable for actions taken within its employment relationship with an employee

26 whose employment tasks involve carrying out the organization's principles of faith and

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

doctrine. *Demkovich*, 3 F4th at 972-73. "The protected interest of a religious organization in its ministers covers the entire employment relationship, including hiring, firing, and supervising in between." *Id.* at 976-77.

In *Our Lady of Guadalupe*, the United States Supreme Court explained how allowing judicial review of a religious organization's employment decisions would be an intolerable intrusion into a religious organization's self-governance:

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Our Lady of Guadalupe*, 140 S Ct at 2055.

The ministerial exception usually arises in the context of a former employee's employment-related action against a religious organization, such as the employment discrimination claims at issue in *Our Lady of Guadalupe*. Although Plaintiff does not allege an employment discrimination claim against LCMS, the ministerial exception is implicated here because Plaintiff alleges LCMS's employment-related decisions—and specifically its refusal to approve CUP's new permanent president—were motivated by LCMS's religious beliefs and doctrine. Therefore, Plaintiff's claims against LCMS are directly linked to the LCMS's role in approving a new permanent president for CUP—a quintessential employment-related decision that fits within the ministerial exception.

**2.   The First Amendment right to freedom of association protects an organization's right to communicate without fear of its private internal communications being disclosed.**

In addition to its "special solicitude to the rights of religious organizations," *Hosanna-Tabor*, 565 US at 189, the First Amendment guarantees the freedom of association.

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

The right to freedom of association encompasses the "freedom to engage in association" with others "for the advancement of beliefs and ideas." *NAACP v. State of Ala. ex rel. Patterson*, 357 US 449, 460, 78 S Ct 1163, 2 L Ed 2d 1488 (1958).

Most importantly for purposes of this case, freedom of association protects against compelled disclosures that would "make it more difficult for members of [the] association to foster their beliefs." *In Re Motor Fuel Temperature Sales Practices Litig.*, 641 F3d 470, 489-90 (10th Cir 2011). Thus, freedom of association precludes forced disclosures that would "stifle full and frank discussions within and among" the association's members. *Id.* at 490; *Perry v. Schwarzenegger*, 591 F3d at 1163 (freedom of association protects against forced disclosures of communications that would "have a deterrent effect on the free flow of information" by infringing on the "right to exchange ideas and formulate strategy and messages, and to do so in private.") (footnote omitted).

### 3. The opinions in *Whole Woman's Health* and *Perry* illustrate the analysis required when evaluating a claim of First Amendment privilege against discovery in civil litigation.

Two decisions provide useful guidance for evaluating discovery demands that threaten to infringe on First Amendment privileges: *Whole Woman's Health v. Smith*, 896 F3d 362 (5th Cir 2018), *cert den*, 139 S Ct 1170 (2019) and *Perry*, 591 F3d 1147.

#### (a) *Whole Woman's Health v. Smith*, 896 F3d 362 (5th Cir 2018), *cert den*, 139 S Ct 1170 (2019).

*Whole Woman's Health* involved a subpoena seeking disclosure of a religious organization's private internal communications regarding abortion policy. Although the Fifth Circuit Court of Appeals ultimately declined to rule on the First Amendment defenses raised in objection to the subpoena, the decision provides a good overview of the issues involved when discovery demands seek to probe a religious organization's private communications regarding matters of religious faith and tenets.

The case began when Texas enacted laws governing the disposal of embryonic and

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   fetal tissue remains. Whole Woman's Health challenged the laws. The Texas Conference of

2   Catholic Bishops ("Bishops"), an unincorporated ecclesiastical association of Texas bishops

3   and archbishops, did not become a party to the litigation, but did plan to participate in

4   defending the laws by offering testimony in support of the laws.

5       Whole Woman's Health issued a subpoena to the Bishops seeking documents

6   pertaining to the Bishops' communications regarding embryonic and fetal tissue remains,

7   miscarriage, abortion, as well as the laws at issue.

8       The Bishops moved to quash the subpoena. Among the grounds asserted was that the

9   subpoena violated the Bishop's First Amendment rights. The Bishops also argued the

10  subpoena violated Fed. R. Civ. P. 45(d) because it was unduly burdensome.

11      The Bishops ultimately turned over 4,321 pages of records, but withheld others based

12  on, among other grounds, the First Amendment and Fed. R. Civ. P. 45(d). After the district

13  court denied the Bishops' motion to quash, the Bishops appealed to the Fifth Circuit Court of

14  Appeals.

15      The court began by observing the district court's "analysis was incorrectly dismissive

16  of the seriousness of the issues raised by [the Bishops]," and noted the district court had

17  improperly treated the matter as "a garden variety dispute over the necessity of

18  discovery * * *." 896 F3d at 369, 370. Those observations also fairly describe Plaintiff's

19  attitude toward LCMS's constitutional concerns: Plaintiff is dismissive of the seriousness of

20  the constitutional concerns LCMS has raised, and Plaintiff's attitude suggests this motion

21  presents nothing more than a "garden variety dispute over the necessity of discovery."

22      In *Whole Woman's Health*, the appellate court reversed the order denying the

23  Bishop's motion to quash. *Id.* at 376. Relying on the doctrine of constitutional avoidance, the

24  court elected to base its decision on Fed. R. Civ. P. 45(d) rather than the constitutional

25  grounds. *Id.* at 370. However, the court was sufficiently concerned with "the district court's

26  insensitive constitutional approach" that it nonetheless surveyed the manifold constitutional

Page 9–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
      SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1   problems with the subpoena. *Id.* (footnote omitted).

2         The court found "[b]oth free exercise and establishment clause problems seem

3   inherent in the court's discovery order." *Id.* at 373. The court expressed concern that

4   allowing discovery of the Bishop's internal communications would not only "interfere[] with

5   [the Bishop's] decision-making processes on a matter of intense doctrinal concern" but

6   would also "expose[] those processes to an opponent and will induce similar ongoing

7   intrusions against religious bodies' self-government." *Id.* The court also noted that putting a

8   court in the position of determining which communications are discoverable "facts" and

9   which are protected "religious" communications would be "tantamount to judicially creating

10   an ecclesiastical test in violation of the Establishment Clause." *Id.* The court referred to

11   United States Supreme Court precedent warning against "'the significant burden on a

12   religious organization to require it, on pain of substantial liability to predict which of its

13   activities a secular court will consider religious * * * [A]nd an organization might

14   understandably be concerned that a judge would not understand its religious tenets and sense

15   of mission.'" *Id.* (quoting *Corp. of the Presiding Bishop of the Church of Jesus Christ of*

16   *Latter-day Saints v. Amos*, 483 US 327, 336, 107 S Ct 2862, 97 L Ed 2d 273 (1987)).

17         The court concluded by stating "[a]ssuming the seriousness of the chilling effects on

18   their First Amendment rights, it is hard to see how the plaintiffs have borne their burden

19   under *Perry* [*v. Schwarzenegger*] to show a substantial need for the documents that

20   outweighs the intrusion in [the Bishop's] constitutional rights." *Id.* at 374.

21         **(b)**   ***Perry v. Schwarzenegger*, 591 F3d 1147 (9th Cir 2010).**

22         *Perry* involved discovery infringing on a different First Amendment protection, the

23   freedom of association. LCMS has invoked the freedom of association as an additional basis

24   for opposing Plaintiff's discovery requests.

25         *Perry* involved a challenge to California's law providing that "[o]nly marriage

26   between a man and a woman is valid or recognized in California." 591 F3d at 1152. When

Page 10–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Exhibit 9 to CTX Motion for Protective Order
Page 18 of 39

1  California's attorney general declined to defend the law's constitutionality, the district court

2  allowed the law's proponents to intervene to defend the law. *Id.* at 1153.

3      The plaintiffs sought discovery of the proponents' internal campaign communications

4  concerning strategy and messaging. *Id.* The proponents objected on the grounds the

5  discovery requests infringed on their First Amendment free association rights. The district

6  court denied the proponents' motion for a protective order. On mandamus review, the Ninth

7  Circuit agreed with the proponents and ordered the district court to enter a protective order in

8  favor of the proponents. *Id.* at 1165.

9      Several aspects of *Perry* deserve emphasis.

10      In evaluating whether the plaintiff's discovery requests infringed on the proponents'

11  free association rights, the Ninth Circuit explained that the right to free association extended

12  beyond protecting participation in an association by, for example, denying discovery of

13  membership lists. Instead, it also reached an association's private internal communications.

14  *Id.* at 1162-63. As the court said "disclosure of internal campaign information can have a

15  deterrent effect on the free flow of information within campaigns. Implicit in the right to

16  associate with others to advance one's shared political beliefs is the right to exchange ideas

17  and formulate strategy and messages and to do so in private." *Id.* at 1162. "Compelling

18  disclosure of internal campaign communications can chill the exercise of these rights." *Id.* at

19  1162-63.

20      This is precisely the argument LCMS makes: the right to associate includes the right

21  to communicate and deliberate on questions of faith and doctrine; to exchange ideas and

22  formulate strategy as to actions based on such faith and doctrine; and to do so in private. The

23  threat of forced disclosure chills LCMS's ability to deliberate sensitive questions regarding

24  ecclesiastical matters of great doctrinal concern.

25      *Perry* is also notable because of its two-part test for evaluating a claim that a

26  discovery request infringes on First Amendment rights. LCMS's motion for a protective

Page 11–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
        SUPPORT OF MOTION FOR PROTECTIVE ORDER

Bullivant|Houser|Bailey PC

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  order discussed that two-part test and suggested it provided a proper methodology for

2  evaluating LCMS's First Amendment claims here.

3      Plaintiff responded that *Perry* has not been adopted in Oregon, and that *Perry* is

4  limited to free association claims. It is true that *Perry* has been neither adopted nor rejected

5  by an Oregon appellate court. LCMS never suggested otherwise. But this court must apply

6  some methodology to the task of evaluating LCMS's First Amendment claims, and the *Perry*

7  approach makes sense. And, notably, Plaintiff has not proposed any analytical framework for

8  addressing the First Amendment issues LCMS has raised.

9      Furthermore, *Perry* is not limited to free association issues. *Perry* itself articulated no

10  such limitation, instead describing its two-part balancing test as applying to any claim of

11  First Amendment privilege. *Perry*, 591 F3d at 1160. In *Whole Woman's Health*, the Fifth

12  Circuit discussed *Perry*'s balancing test in the context of the Bishops' Religion Clause

13  challenges to the plaintiff's discovery requests, and observed "it is hard to see how the

14  plaintiffs have borne their burden under *Perry* to show a substantial need for the documents

15  that outweighs the intrusion into [the Bishops'] constitutional rights." 896 F3d at 374. Thus,

16  *Whole Woman's Health* understood the *Perry* balancing test to apply to First Amendment

17  objections to discovery based on the Religion Clauses. Finally, *Perry* has been applied to

18  discovery requests seeking information about religious beliefs and practices. *Guthrey v.*

19  *California Dept. of Corrections and Rehabilitation*, No. 1:10-cv-02177-AWI-BAM, 2012

20  WL 2499938 (ED Cal 2012) (applying the *Perry* balancing test to the plaintiff's efforts to

21  discover defendant's religious beliefs and practices). Thus, Plaintiff's criticisms of *Perry*'s

22  applicability are unavailing.

23  **4.    Plaintiff has not demonstrated its desire to probe LCMS's private**
24  **internal communications outweighs LCMS's First Amendment**
       **protections.**

25  *Perry* presents a two-part balancing test for evaluating the assertions of a First

26

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Exhibit 9 to CTX Motion for Protective Order
Page 20 of 39

1    Amendment privilege against a discovery request in civil litigation. The party asserting the

2    First Amendment privilege must make a prima facie showing that enforcement of the

3    discovery request will infringe on First Amendment protections. *Perry*, 591 F3d at 1160. If

4    that showing is established, the burden shifts to the party seeking discovery to demonstrate

5    an interest in obtaining the disclosures it seeks that is sufficient to justify infringing on First

6    Amendment rights. *Id.* at 1161. Relevant factors include (1) the importance of the litigation;

7    (2) the centrality of the information sought to the issues in the case; (3) the existence of less

8    intrusive means of obtaining the information; and (4) the substantiality of the First

9    Amendment interests at stake. *Id.* "Importantly, the party seeking discovery must show that

10    the information sought is highly relevant to the claims or defenses in the litigation—a more

11    demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)."

12    *Id.*

13       LCMS's motion for a protective order challenged Plaintiff to make this showing;

14    Plaintiff has failed to even attempt to answer the challenge.

15       The threatened infringement on LCMS's rights of church autonomy and free

16    association are indisputable. The church-autonomy doctrine "prohibits civil court review of

17    internal church disputes involving matters of faith, doctrine, church governance, and polity."

18    *Bryce*, 289 F3d at 655. The right of free association includes protecting a religious

19    organization's ability to communicate freely about questions of church doctrine, policy, and

20    governance without the chilling effect of fearing compelled disclosure of the

21    communications in civil litigation. *Perry*, 591 F3d at 1162-63.

22       These First Amendment privileges are threatened by Plaintiff's desire to invade

23    LCMS's sphere of private communications about LCMS's response to what Plaintiff has

24    described as a wayward affiliated organization's defiance and disobedience to the

25    fundamental tenets of the faith. Plaintiff has made no showing sufficient to justify such an

26    intrusion.

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

### (a)    LCMS does not argue either that religious organizations may not be sued or that religious organizations are exempt from discovery.

The overarching theme of Plaintiff's opposition, presented in a variety of guises, is that LCMS's motion for a protective order is misplaced because religious organizations are generally subject to civil suits and discovery is permitted in such cases. Plaintiff also makes the hyperbolic argument that LCMS "seeks to erect a wall preventing ***any*** discovery into its decision making, and the decision making of all its subsidiaries, in connection with contract breaches." (Opposition at 2) (emphasis added.) In support of this argument, Plaintiff cites numerous cases as examples that religious organizations may be sued for tortious wrongdoing and breach of contract and that discovery may be conducted in such cases. *See, e.g.*, Plaintiff's citations to *Minker v. Balt. Ann. Conf. of United Methodist Church*, 894 F2d 1354 (DC Cir 1990) (Opposition at 7) and *Fearing v. Bucher*, 328 Or 367, 977 P2d 1163 (1999) (Opposition at 5), among many others.

Plaintiff's argument carries no sway because it misstates LCMS's position. LCMS has never argued religious organizations are not subject to civil liability. To the contrary, LCMS acknowledges the church-autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws[.]" *Our Lady of Guadalupe*, 140 S Ct at 2060. Nor does LCMS argue it is not subject to any discovery; to the contrary, in this case LCMS has produced more than 20,000 pages of documents in six separate productions. (Declaration of Gabriel M. Weaver in Support of HotChalk's Opposition to the Synod's Motion for Protective Order, ¶ 2.) The production of 20,000 pages of documents is not the act of a party claiming it is not subject to discovery.

Instead, the issue is much narrower: may Plaintiff discover LCMS's private internal communications regarding ecclesiastical matters. Plaintiff has not made the showing needed to overcome LCMS's First Amendment privilege.

Page 14–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE    Document 39-9    Filed 09/16/24    Page 22 of 39
Exhibit 9 to CTX Motion for Protective Order
Page 22 of 39

    **(b)**    **LCMS does not argue that every infringement on religious rights is unconstitutional.**

Relying on cases such as *Newport Church of Nazarene v. Hensley*, 335 Or 1, 56 P3d 386 (2002) and *Bollard*, 196 F3d 940, Plaintiff argues that the First Amendment presents no obstacle to Plaintiff's discovery of LCMS's private internal communications regarding ecclesiastical matters because both Oregon and federal courts have upheld laws that were challenged as unconstitutional infringements on religious freedom.

Plaintiff's argument is irrelevant. LCMS does not challenge the constitutionality of any law, nor does LCMS dispute that under conventional First Amendment analysis, a law that incidentally burdens religious freedoms may withstand a constitutional challenge. *United States v. Lee*, 455 US 242, 259, 102 S Ct 1051, 71 L Ed 2d 127 (1982) (upholding laws requiring payment of Social Security taxes against a challenge that paying such taxes violated principles of the Amish faith).

In *Newport Church* the question was whether a state law making ministers eligible for unemployment benefits violated either the Free Exercise or Establishment Clauses. After balancing the infringement of religious rights against the state's interest in providing unemployment compensation, the Oregon Supreme Court held the unemployment compensation laws did not unduly burden the church's religious freedoms in a way that violated the First Amendment. *Id.* at 15.

*Newport Church* and the many other cases Plaintiffs cite for the same proposition are not useful because LCMS's motion for a protective order neither challenges the constitutionality of any law nor argues LCMS is exempt from any law. Instead, it asks for a balancing of the severity of the infringement of LCMS's First Amendment rights against Plaintiff's purported need for discovery of LCMS's private internal communications regarding ecclesiastical matters. That is similar to the balancing the Oregon Supreme Court performed in *Newport Church*, and which Plaintiff argues this court should not conduct.

Page 15–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Plaintiff also cites cases such as *M.K. v. Archdiocese of Portland*, 228 F Supp 2d 1168 (D Or 2002) for the proposition that consideration of a religious organization's principles in the context of civil litigation does not necessarily violate the First Amendment. This is another strawman argument. The question presented by LCMS's motion is not whether its religious tenets may be considered. Instead, it is whether Plaintiff may have discovery of LCMS's private internal communications about the scope and shape of those tenets and whether, and how, it will enforce them when an affiliated institution defies those tenets.

**(c)    The church-autonomy doctrine arises from both Religion Clauses.**

LCMS relies on the church-autonomy doctrine as the basis for its argument that private internal communications are not discoverable. LCMS further argues that the church-autonomy doctrine arises from both the Free Exercise and Establishment Clauses.

Plaintiff responds that in its 2002 decision in *Newport Church*, the Oregon Supreme Court said "the [autonomy] doctrine has its basis in the Free Exercise Clause, not the Establishment Clause." 335 Or at 15. With respect, the Oregon Supreme Court was wrong.

In *Our Lady of Guadalupe*, the United States Supreme Court identified both "Religion Clauses" as the sources of religious organizations' right to decide matters of faith and doctrine without government intrusion. 140 S Ct at 2060. Many federal courts have similarly noted the church-autonomy doctrine is grounded in both Religion Clauses. *See, e.g.*, *Korte*, 735 F3d at 677 (the church-autonomy doctrine "has a foothold in both Religion Clauses"); *Huntsman v. Corp. of Pres. Of Church of Jesus Christ of Latter-Day Saints*, No. 2:21-cv-02504, 2021 WL 4296208 (September 10, 2021) (church-autonomy doctrine is based on both the Free Exercise and Establishment Clauses).

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

### (d) Plaintiff's fraud allegations do not eviscerate the church-autonomy doctrine and LCMS's right to free association.

Plaintiff argues there is no constitutional barrier to the discovery it seeks because it alleges (among its 11 counts) a fraud claim. (Opposition at 11-12.)

LCMS here again notes that Plaintiff does not contend LCMS's alleged actions were not taken in furtherance of sincerely held religious beliefs. Thus, whatever nature of fraud Plaintiff has in mind, it does not involve any contention that LCMS did not act on sincerely held religious beliefs.

Furthermore, none of the cases Plaintiff cites support such a sweeping exception to the First Amendment's protections.

In *Jeong v. Cal. Pacific Ann. Conf.*, No. 92-55370, 1992 WL 332160 (9th Cir 1992), in an unpublished memorandum disposition, the court affirmed the dismissal of the plaintiff's fraud claim for failure to state a claim for relief. The case was decided based on the pleadings and involved no issue about the scope of permissible discovery in a fraud action.

In *Christofferson v. Church of Scientology of Portland*, 57 Or App 203, 644 P2d 577, *rev den*, 293 Or 456 (1982), *cert den*, 459 US 1206, 1227 (1983), the Oregon Court of Appeals considered questions regarding whether, in a fraud action against the Church of Scientology, it was appropriate to allow the jury to decide which of the church's statements were "religious" and, therefore, not actionable in a fraud claim. Although *Christofferson* involved an interesting question (and its conclusion is certainly doubtful in view of legal trends in the United State Supreme Court regarding the scope of the First Amendment's protections for religious organizations), the case ultimately has nothing to do with whether either the church-autonomy doctrine or the right of free association precludes Plaintiff's discovery efforts here. *Christofferson* can be seen as supporting the proposition that religious organizations are not, per se, immune from fraud actions. But since LCMS makes no such

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Exhibit 9 to CTX Motion for Protective Order
Page 25 of 39

1    contention, *Christofferson* is unhelpful.

2         In *In Re Roman Catholic Archbishop of Portland in Oregon*, 335 BR 815 (D Or

3    2005), the district court allowed inquiry into church policies and practices relevant to claims

4    of sexual abuse. The court said the claims for sexual abuse alleged against the church

5    implicated no matters of ecclesiastical or theological doctrine. *Id.* at 825. The case is

6    inapposite because here, Plaintiff's claims against LCMS directly implicate questions of the

7    LCMS's doctrinal principles, and the actions LCMS took to advance those principles.

8    Having introduced those issues into the case, Plaintiff must live with the consequences.

9         In short, LCMS does not deny that a religious organization may be sued for fraud. It

10    does dispute Plaintiff's contention that alleging a fraud claim erases the protections otherwise

11    provided by the First Amendment.

12
        **(e)**      **The neutral laws doctrine does not justify intrusion into**
13                     **church autonomy.**

14         On several occasions, Plaintiff suggests this matter should be resolved by application

15    of the so-called "neutral laws" doctrine. LCMS disagrees.

16         LCMS discussed the neutral laws doctrine in its motion, but only in the context of

17    anticipating Plaintiff's argument and addressing why the doctrine does not apply here,

18    namely, because whether Plaintiff is entitled to discovery does not involve the application of

19    a neutral law of general applicability because the discovery rules are filled with the types of

20    discretionary exceptions the United States Supreme Court has recently held take a law

21    outside the realm of neutral laws of general applicability. *Fulton v. City of Philadelphia*, 141

22    S Ct 1868 (2021).

23         But there is a more fundamental reason the neutral laws approach is inapplicable here:

24    the United States Supreme Court has held the neutral laws doctrine may not be invoked to

25    justify an infringement on church autonomy.

26         The United States Supreme Court discussed this point in *Hosanna-Tabor*, the case in

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    which the court held the First Amendment's Religion Clauses give rise to a ministerial

2    exception that makes religious organizations immune from suit for employment decisions

3    involving persons who qualify as "ministers" for purposes of the doctrine.

4         The plaintiff in *Hosanna-Tabor* argued the statutes at issue there (upon which the

5    claims were based) were neutral laws of general applicability and could, therefore, be applied

6    to religious organizations under a traditional First Amendment analysis weighing the

7    infringement of religious freedoms against the law's purposes. But the Supreme Court

8    rejected that argument, holding the neutral laws doctrine inapplicable where church

9    autonomy is at issue. 565 US at 190. The court explained the neutral laws doctrine may have

10   application to laws governing "outward physical acts" (such as the consumption of peyote at

11   issue in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 US 872, 110 S Ct

12   1595, 108 L Ed 2d 876 (1990)) but "[t]he contention that *Smith* forecloses recognition of a

13   ministerial exception rooted in the Religion Clauses has no merit."

14        Indeed, 10 years earlier in *Newport Church*, the Oregon Supreme Court anticipated

15   this holding when it noted "[t]he applicability of *Smith* in the context of church autonomy is

16   not clear." 335 Or at 13.

17        Thus, the neutral laws doctrine does not grant permission for an intrusion into church

18   autonomy.

19        **(f)    Plaintiff does not need discovery to determine whether the**
20               **president of CUP fits within the ministerial exception.**

21        The ministerial exception is a specific application of the church autonomy doctrine in

22   the context of a religious organization's employment decisions. The ministerial exception

23   was recognized in *Hosanna-Tabor* and further developed in *Our Lady of Guadalupe*.

24        "The ministerial exception, grounded in the First Amendment's Religion Clauses,

25   protects religious organizations from employment discrimination suits brought by their

26   ministers." *Demkovich*, 3 F4th at 972-73. "Under this rule, courts are bound to stay out of

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE     Document 39-9     Filed 09/16/24     Page 27 of 39
Exhibit 9 to CTX Motion for Protective Order
Page 27 of 39

1  employment disputes involving those holding certain important positions with churches and

2  other religious institutions." *Our Lady of Guadalupe*, 140 S Ct at 2060.

3          As the United States Supreme Court explained in *Our Lady of Guadalupe*, the phrase

4  "ministerial exception" is something of a misnomer because the exception applies to a

5  universe of employees broader than just "ministers." "The rule appears to have acquired the

6  label 'ministerial exception' because the individuals involved in pioneering cases were

7  describes as 'ministers.'" *Id.* Decisions from the United States Supreme Court and lower

8  courts now make clear that the title "minister" is neither necessary nor sufficient to justify

9  the exception. *Id.* at 2063-64. Instead, "[w]hat matters, at bottom, is what an employee does."

10 *Id.* at 2064.

11         "[E]ducating young people in their faith, inculcating its teachings, and training them

12 to live their faith are responsibilities that lie at the very core of the mission of a private

13 religious school." *Id.* For that reason, the United States Supreme Court and lower courts have

14 consistently held the ministerial exception applies to employees charged with teaching in

15 private religious schools. *Id.* at 2066 (holding that the ministerial exception applied to the

16 plaintiffs, elementary school teachers at private Catholic schools, despite the fact neither

17 teacher's title carried the term "minister"); *Hosanna-Tabor*, 565 US at 190 (applying the

18 ministerial exception to claims by an elementary school teacher who, in addition to having

19 the title "Minister of Religion, Commissioned," was charged with instructing students in

20 religion). Furthermore, the exception has been applied to others whose employment duties

21 involve participating in a religious organization's practice of its faith. *Demkovich*, 3 F4th at

22 978 (applying the ministerial exception to a church organist, music director, and choir

23 director, whose "participation in the liturgy was the reason for his work.").

24         Plaintiff does not dispute that its claims implicate the ministerial exception. Instead,

25 Plaintiff argues it needs discovery to evaluate whether the president of CUP is a position that

26 qualifies for the ministerial exception.

Page 20–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
    SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1    Plaintiff's argument fails because there is no question that the ministerial exception

2    applies to employment decisions regarding the president of CUP. As LCMS has explained,

3    under Synod Bylaws, the president of CUP is the spiritual head of the institution and is

4    responsible "for the provision of spiritual care and nurture for every student." (Declaration of

5    John Sias in Support of Defendant The Lutheran Church—Missouri Synod's Motion for

6    Protective Order, ¶ 13.) The president's duties include "watch[ing] over the spiritual welfare,

7    personal life, conduct, educational progress, and physical condition of the students and in

8    general exercise such Christian discipline, instruction, and supervision as may be expected at

9    a Christian educational institution." (*Id.*)

10    If elementary school teachers at private religious elementary schools are within the

11    ministerial exception, as held in *Our Lady of Guadalupe* and *Hosanna-Tabor*, certainly the

12    president of a private religious university, charged with the "spiritual care" for every student,

13    also comes within the exception. Plaintiff needs no further discovery.

14    **C.    LCMS has not waived its right to argue that allowing discovery into**
15    **LCMS's private internal communications regarding its faith and**
        **religious principles would violate the First Amendment's protections**
16    **for church autonomy and the freedom of association.**

17    **1.    The LCMS's First Amendment rights are not equivalent to any**
        **statutory or common law privilege.**

18    Plaintiff argues LCMS has waived its First Amendment protections.

19    Plaintiff equates the LCMS's First Amendment rights with privileges conferred by

20    common law and codified in the Oregon Rules of Evidence. The equation is inapposite.

21    Evidentiary privileges are designed to protect certain relationships; the rights granted by the

22    First Amendment are intended to protect against governmental intrusion into religious

23    practices. There are important differences in the standards for evaluating the existence of a

24    privilege versus the existence of a constitutional right, and the waiver of a privilege versus

25    the waiver of a constitutional right. Because Plaintiff has failed to recognize these

26

Page 21–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE    Document 39-9    Filed 09/16/24    Page 29 of 39
Exhibit 9 to CTX Motion for Protective Order
Page 29 of 39

1   distinctions, its argument fails.

2       Waiver is "an intentional relinquishment or abandonment of a known right or

3   privilege." *Johnson v. Zerbst*, 304 US 458, 464 (1938). To waive a constitutional right, there

4   must be a knowing and willful surrender of that right. *Walls v. Cent. Contra Costa Transit*

5   *Auth.*, 653 F3d 963, 969 (9th Cir 2011) (*citing Ostlund v. Bobb*, 825 F2d 1371 (9th Cir 1987)

6   ("Waiver of a constitutional right must be knowing and voluntary.").

7       Waiver of a constitutional right "should not be implied and should not be lightly

8   found." *Walls*, 653 F3d at 969. Unlike the attorney-client and priest-penitent privileges

9   analogized to by Plaintiff, constitutional strictures dictate that courts "indulge every

10  reasonable presumption ***against*** waiver of fundamental constitutional rights." *Zerbst*, 304 US

11  at 464 (emphasis added); *see also Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council*

12  *31*, 138 S Ct 2448, 2486, 201 L Ed 2d 924 (2018) (a First Amendment "waiver cannot be

13  presumed."). As a result, "to be effective, the waiver must be freely given and shown by

14  'clear and compelling' evidence." *Janus* 138 S. Ct. at 2486.

15      Plaintiff argues "a privilege is lost when the reason for it ceases to apply."

16  (Opposition at 29.) Plaintiff argues "the central purpose of most privileges is the promotion

17  of some interest or relationship by endowing it with a supporting secrecy or confidentiality."

18  (Opposition at 30.) However, the *reason* or *purpose* of the rights found in the First

19  Amendment go far beyond the protection of individual relationships between priests and

20  penitents or rabbis and congregants. Rather, "[t]he purposes of the First Amendment

21  guarantees relating to religion were twofold: to foreclose state interference with the practice

22  of religious faiths, and to foreclose the establishment of a state religion." *Larkin v. Grendel's*

23  *Den, Inc.*, 459 US 116, 122, 103 S Ct 505, 74 L Ed 2d 297 (1982). These central purposes

24  have nothing to do with relationships between citizens and their church or secrecy between

25  two individuals; instead, the protections at issue here are structural. The reasons for

26  constitutional protections against government interference never cease to apply.

Page 22–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN
    SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Exhibit 9 to CTX Motion for Protective Order
Page 30 of 39

1    Plaintiff further argues that "the party seeking to establish a privilege has the burden

2  to establish the existence of the privilege and the burden to show that the privilege has not

3  been waived." (Opposition at 23.) The burden of showing a defendant has waived a

4  constitutional right remains with the plaintiff. *State v. Carlson*, 225 Or App 9, 14, 199 P3d

5  885, 888 (2008) ("If [plaintiff] argues that defendant waived [a constitutional] right,

6  [plaintiff] also has the burden of showing that waiver."); *State v. Sawyer*, 221 Or App 350,

7  354, 190 P3d 409 (2008) ("The [plaintiff] has the burden of persuasion with respect to the

8  validity of the waiver.").

9    LCMS does not argue a constitutional right can never be waived. However, the court

10  must reject Plaintiff's argument that the First Amendment may cease to apply such that the

11  government, by way of *this* court and the discovery process in *this* case, may interfere with

12  the practice of a religious faith. The court must further reject the erroneous burden shifting

13  Plaintiff advocates. As will be discussed more fully below, the court must reject Plaintiff's

14  incorrect assertion that a fundamental right can be waived by any means other than a

15  *knowing* and *willful* surrender of that right. Furthermore, even if the court finds that LCMS

16  knowingly and willfully waived a constitutional right by disclosing documents or testimony,

17  such a waiver must be narrowly construed and should apply only to the specific documents

18  or testimony previously disclosed.

19    **2.    LCMS has consistently asserted its First Amendment rights.**

20    Plaintiff asserts LCMS waived its First Amendment rights by failing to assert its

21  privilege during the depositions of Terry Wilson and Kathleen Hone. However, LCMS has

22  consistently asserted its First Amendment rights.

23    Below is a chart of every appearance LCMS has made in this case, noting when a

24  First Amendment right was asserted.

25

26

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

| Document | Date | First Amendment rights asserted |
|---|---|---|
| LCMS's Response To Plaintiff's First Request For Production Of Documents | 6/22/2020 | General Objections: A, M; Specific Objections: RFP 4, 30, 32 |
| LCMS Motion to Dismiss (MTD) | 7/2/2020 | Pages 3, 23-26, 36, 38 |
| LCMS Reply to MTD | 8/24/2020 | Page 12-13, MTD 23-26 incorporated by reference |
| Hearing on MTD | 9/18/2020 | Pages 127 and 137 |
| LCMS's Supplemental Response To Plaintiff's First Request For Production Of Documents | 1/21/2021 | General Objections: A, B, D, M, P; Specific Objections: RFP 1, 4, 30, 32 |
| LCMS MTD Amended Complaint (MTD-AC) | 4/30/2021 | Pages 11, 14 |
| LCMS Reply to MTD-AC | 7/23/2021 | Pages 9-11 |
| Hearing on MTD-AC | 9/17/2021 | Pages 174, 177, 179, 180, 187-210, 223, 299-302 |
| Deposition of Terry Wilson | 4/28/2021, 8/30/2021 | TR 87:22-88:24; 121:14-15; 122:5-8; 125:12-13; 141:2-7; 156:3-4, 11-12; 155:3-8, 15; 162:12-14, 22; 163:1; 263:24-264:18 (standing objection). Weaver Dec., Ex L.[3] |
| Deposition of Kathy Hone | 8/26/2021 | TR 40:12-41:8; 49:23-50:8; 74:20-75:2 (reiterate standing objection). Weaver Dec., Ex. M. |

Plaintiff's allegations that LCMS did not preserve its privilege are not only without merit but also misleading. For example, Plaintiff asserts LCMS did not object to Mr. Wilson's testimony at 87:1-88:23. (Weaver Dec., Ex L.) However, Plaintiff's own cited excerpt shows that LCMS's counsel objected to this question at 88:17. (*Id*.)

Plaintiff also cites pages 115:19-117:5, neglecting to note that LCMS's counsel again objected to this question at 117:12-23. (*Id.*)

Finally, Plaintiff cites 288:23-289:10 despite the fact that at 263:24-264:18, LCMS's counsel raised a "continuing objection on questions related to selection of a minister, church governance and discussions of doctrine." (*Id*. (Tr. 263:2-4).) Mr. McDermott replied for

---

[3] Additional excerpts from the deposition of Terry Wilson and Kathleen Hone are available to the Court upon request.

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Plaintiff that he would "obviously agree that you can have a standing objection…to this line of questioning."  (*Id.* (Tr. 263:12-15).) These excerpts do not support Plaintiff's claim of waiver.

With respect to Ms. Hone's deposition, Plaintiff provided similar erroneous examples at 109:7-110:10; 136:5 -137:19; 141:6 -143:12; 149:2-11; 154:21-155:18. Plaintiff did not mention that at 74:20-23, before any of these cited examples occurred, LCMS's counsel reiterated the "standing objection that I'm assuming I have…on the First Amendment issues." Mr. McDermott replied on behalf of Plaintiff at 74:24-75:1, "yeah, you don't need to interject…on a question-by-question basis." (Weaver Dec., Ex. M.) Again, Plaintiff has failed to accurately report what happened.

### 3.    Subject-matter waiver does not apply to First Amendment rights.

In the penultimate paragraph to its Opposition, Plaintiff again erroneously compares waiver of a First Amendment right to waiver of the attorney-client privilege, claiming that a waiver of a fundamental right "is coextensive with the subject matter of the testimony elicited or documents produced." (Opposition at 36.) Relying again on the erroneous analogy to attorney-client privilege, and citing no case law relevant to any constitutional right, Plaintiff argues LCMS's document production, public statements, and the production by third parties, was a complete subject-matter waiver of the LCMS's First Amendment rights in all future productions. This is incorrect.

Subject-matter waiver of attorney-client privilege is appropriate when "voluntary disclosure of the content of a privileged attorney communication [should constitute] waiver of the privilege as to all other such communications on the same subject" because fairness dictates that those communications should be considered together. *United States v. Sanmina Corp.*, 968 F3d 1107, 1117 (9th Cir 2020); *see also K.F. v. Baker Sch. Dist.* 5J, 2021 WL 863198, at *3-4 (D Or 2021) (stating that federal law "permits extension of a waiver to an undisclosed communication or information only if they ought in fairness to be considered

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  together" and that "the Ninth Circuit [has recently] affirmed that [this]

2  principle * * * animates the concept of subject-matter waiver") (quotations omitted).

3  However, Oregon courts do not apply subject-matter waiver to all waivers of all privileges.

4  *See, e.g.*, *Meyer v. State by & through Oregon Lottery,* 292 Or App 647, 664, 426 P3d 89

5  (2018) ("Work-product waiver is generally treated on a per document basis and not based on

6  subject-matter waiver."); *Mobil Oil v. United States EPA*, 879 F2d 698, 700–01 (9th Cir

7  1989) (holding that subject-matter waiver does not apply to the FOIA exemption privilege).[4]

8  In fact, in the discovery context, the American Bar Association stated it is "of the opinion

9  that broad concepts of subject matter waiver analogous to those applicable to claims of

10 attorney-client privilege are inappropriate when applied to Rule 26(b)(3)." Edna Selan

11 Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine*, 3d ed, Section of

12 Litigation, American Bar Association (1997) at 404 (citing *Duplan Corp. v. Deering

13 Milliken, Inc.*, 540 F2d 1215, 1222 (4th Cir 1976)).

14       Further, LCMS did not locate any case applying subject-matter waiver to a First

15 Amendment right. Where a court finds a party has knowingly and willfully waived such a

16 right, despite the significant barriers to doing so, that waiver is "narrowly construe[d] and

17 only read to include [the constitutional rights] explicitly waived." *U.S. v. Berger,* 473 F3d

18 1080, 1095 (9th Cir 2007). In the context of document production, narrow construction of a

19 waiver of a constitutional right harmonizes with the document-by-document waiver of work

20 product protection from *Meyer*, and it clashes with the categorical waiver of attorney-client

21 privilege. *Meyer*, 292 Or App at 664. At the very least, accordingly, the court should adopt a

22 narrow standard for evaluating waiver under the First Amendment in accordance with the

23

24 ───────────────
   [4] *See also In re Sealed Cases*, 121 F3d 729, 741 (DC Cir 1997) ("all-or-nothing" approach of
25 subject matter waiver has not been applied to claims of deliberative privilege); *Marisol v.
   Giuliani*, No. 95 Civ. 10533(RJW), 1998 WL 132810, at *7 (SDNY Mar. 23, 1998) (public
26 release of information did not amount to subject-matter waiver of executive privilege).

**Bullivant|Houser|Bailey PC**
One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

work-product waiver articulated in *Meyer. Id.* ("Work-product waiver is generally treated on a per document basis and not based on subject-matter waiver."); *see also Berger*, 473 F3d at 1095. This standard is consistent with Oregon law, the substantiality of the First Amendment interests at stake, and the heightened standard that parties seeking discovery of such documents must show.

### 4. The production of the documents cited by Plaintiff has not resulted in waiver of LCMS's First Amendment rights.

Plaintiff contends that LCMS has waived its First Amendment rights through the production of six specific documents. While these documents do address issues such as the Gender and Sexuality Resource Center, the LGBTQ+ club charter, the tenure of CUP's former president, a timeline of visits to the CUP campus, and the content of CUP's website, each document is comprised of factual statements and reflects a business or financial decision made by the parties. Rather than evidence of any kind of waiver, producing these documents demonstrates that the LCMS is not simultaneously using its First Amendment right as a sword and a shield. Where a document touches on factual issues or business decisions, it has been produced, and where such a document touches on religious considerations or matters of doctrinal identity, it has been marked confidential.

Notably, each of these documents was labeled "Confidential" pursuant to the Stipulated Protective Order ("SPO"). (Amended Stipulated Protective Order, May 14, 2021.)

Plaintiff further alleges that keyword searches have revealed a number of documents responsive to "presidential search" OR "search committee." Our review of these key words indicates that 77 of the 111 hits Plaintiff has identified were various versions of the LCMS Handbook. The handbook is publicly available, and LCMS asserts no basis for withholding it. The majority of hits for "prior approval panel" OR "PAP" were included in the first search. Of those that were not included, nearly half were logistical discussions regarding meeting times and agendas. A search for "LGBTQ" OR "gender /5 resource" revealed over a

Page 27–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

third of the documents were news articles, Google alerts, or communications with news media. These overly broad characterizations of LCMS's document production do not support a claim of subject-matter waiver of any privilege, let alone a fundamental constitutional right.

### 5. Production of documents by any other defendant cannot waive LCMS's First Amendment rights.

Plaintiff argues that LCMS waived its First Amendment rights when CUP, a separate corporate entity (in Plaintiff's words) "produced multiple documents concerning Synod doctrine regarding LGBTQ issues, the Synod's termination of CUP's 35-year president, and the Synod's obstruction of CUP's efforts to find and install a new permanent president." (Opposition at 26.) Plaintiff initially submitted into the public record documents marked confidential pursuant to the SPO. Setting aside Plaintiff's failure to comply with this court's order, "it is inconceivable that the Constitution could countenance the waiver of a [party's constitutional right] by a third party." *Schneckloth v. Bustamonte*, 412 US 218, 246, 93 S Ct 2041, 36 L Ed 2d 854 (1973). CUP's disclosure is not a waiver of LCMS's First Amendment rights because CUP cannot surrender LCMS's First Amendment rights.

### 6. Public statements cannot waive the LCMS's First Amendment rights.

Plaintiff also argues LCMS waived its First Amendment rights through public statements related to its position on LGBTQ+ issues and the appointment of a permanent president to CUP. (Opposition at 34.) Not only does Plaintiff mischaracterize the public statements showing concern over CUP's violation of church doctrine as an "intention to interfere in CUP's appointment of a permanent president" and "plans to obstruct CUP's operations," but Plaintiff mistakenly bases the alleged waiver on the proposition that a First Amendment right must be "secret" to remain protectable. (Opposition at 35.) While that might be true for attorney-client privileged communications, that has nothing to do with

Page 28–DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

1  religious freedom granted by the United States Constitution. If it did, religious groups'

2  ability to develop doctrine and points of spiritual identity would be utterly chilled. *In re*

3  *Diocese of Lubbock,* 624 SW3d 506, 518-19 (Tex 2021) ("The [ecclesiastical protection]

4  doctrine allows a religious institution to engage freely in ecclesiastical discussions with more

5  than just its members. It extends to publications that relate to a religious group's right to

6  shape its own faith and mission.") Secrecy has no bearing on the ability of a church to remain

7  free of government control.

### III.  CONCLUSION

8

9  This court should grant LCMS's motion for a protective order.

10  DATED: November 23, 2021.

11  BULLIVANT HOUSER BAILEY PC

12

13  By  /s/ *Thomas L. Hutchinson*
       Thomas L. Hutchinson, OSB #994896
14     E-mail: tom.hutchinson@bullivant.com
       Laura Caldera, OSB #993786
15     E-mail: laura.caldera@bullivant.com

16  Attorneys for Defendant The Lutheran
17  Church—Missouri Synod

18

19  4821-1792-2808.1

20

21

22

23

24

25

26

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

Case 1:23-cv-01042-DAE   Document 39-9   Filed 09/16/24   Page 37 of 39
**Exhibit 9 to CTX Motion for Protective Order**
**Page 37 of 39**

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on November 23, 2021, I caused to be served the foregoing DEFENDANT THE LUTHERAN CHURCH-MISSOURI SYNOD'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER on the following parties at the following addresses:

| | |
|---|---|
| James T. McDermott<br>Gabriel M. Weaver<br>McDermott Weaver Connelly Clifford LLP<br>1000 SW Broadway, Suite 960<br>Portland, OR 97205<br>jmcdermott@mwcc.law<br>gweaver@mwcc.law<br><br>*Attorneys for Plaintiff* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☒ E-Mail<br>☐ Odyssey File & Serve™ |
| Thomas C. Sand<br>Ian Christy<br>John Clarke<br>Miller Nash Graham & Dunn LLP<br>111 SW Fifth Avenue, Suite 3400<br>Portland, OR 97204<br>tom.sand@millernash.com<br>ian.christy@millernash.com<br>john.clarke@millernash.com<br>amy.jones@millernash.com<br>janna.leasy@millernash.com<br><br>*Attorneys for Defendant Lutheran Church Extension Fund* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☒ E-Mail<br>☐ Odyssey File & Serve™ |
| Janet M. Schroer<br>Matthew J. Kalmanson<br>Hart Wagner LLP<br>1000 SW Broadway, 20th Floor<br>Portland, OR 97205<br>JMS@hartwagner.com<br>MJK@hartwagner.com<br>IOW@hartwagner.com<br>FRH@hartwagner.com<br><br>*Attorneys for Defendant Concordia University System* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☒ E-Mail<br>☐ Odyssey File & Serve™ |

**Exhibit 9 to CTX Motion for Protective Order**
**Page 38 of 39**

| | | |
|---|---|---|
| 1 | William L. Larkins, Jr. | ☐ U.S. Mail |
| | Christopher J. Kayser | ☐ Facsimile |
| 2 | Heather K. Cavanaugh | ☐ Hand Delivery |
| | 121 SW Morrison Street, Suite 700 | ☐ Overnight Courier |
| 3 | Portland, OR 97204 | ☒ E-Mail |
| | wlarkins@lvklaw.com | ☐ Odyssey File & Serve™ |
| 4 | cjkayser@lvklaw.com | |
| | hcavanaugh@lvklaw.com | |
| 5 | amilligan@lvklaw.com | |
| | ahollowell@lvklaw.com | |
| 6 | | |
| 7 | *Attorneys for Defendant Concordia* | |
| | *University, St. Paul* | |
| 8 | | |
| 9 | Jane E. Maschka | ☐ U.S. Mail |
| | Josh Peterson | ☐ Facsimile |
| 10 | Faegre Drinker Biddle & Reath LLP | ☐ Hand Delivery |
| | 2200 Wells Fargo Center | ☐ Overnight Courier |
| 11 | 90 South Seventh Street | ☒ E-Mail |
| | Minneapolis, MN 55402 | ☐ Odyssey File & Serve™ |
| 12 | Jane.maschka@faegredrinker.com | |
| | Josh.peterson@faegredrinker.com | |
| 13 | | |
| 14 | *Attorneys for Defendant Concordia* | |
| | *University, St. Paul* | |
| 15 | | |
| 16 | C. Robert Steringer | ☐ U.S. Mail |
| | Randolph Geller | ☐ Facsimile |
| 17 | Julian Marrs | ☐ Hand Delivery |
| | Harrang Long Gary Rudnick PC | ☐ Overnight Courier |
| 18 | 1050 SW Sixth Avenue, Suite 1600 | ☒ E-Mail |
| | Portland, OR 97204-1116 | ☐ Odyssey File & Serve™ |
| 19 | bob.steringer@harrang.com | |
| | randy.geller@harrang.com | |
| 20 | julian.marrs@harrang.com | |
| | tessa.landis@harrang.com | |
| 21 | | |
| 22 | *Attorneys for Defendants Concordia* | |
| | *University (aka Concordia University-* | |
| 23 | *Portland), Charles E. Gerken, Kathleen* | |
| | *Hone; Terry Wilson; Jerry Baltzell; David O.* | |
| 24 | *Berger; Michael Borg; Dr. Charles E.* | |
| | *Brondos; Gerald Koll; Rev. Paul Linnemann;* | |
| 25 | *Jeff Oltmann; Rev. Kurt Onken; Rev. Timothy* | |
| | *Pauls; Bev Peloquin; Dr. Rod Wegener; Rev.* | |
| 26 | *Sam Wiseman; Rev. Thomas John Zelt, and* | |
| | *Brian T. Yamabe* | |

Page 2– CERTIFICATE OF SERVICE

**Bullivant|Houser|Bailey PC**

One SW Columbia Street, Suite 800
Portland, Oregon 97204-4022
Telephone: 503.228.6351
Facsimile: 503.295.0915

**Exhibit 9 to CTX Motion for Protective Order**
**Page 39 of 39**

| | | |
|---|---|---|
| S. Ward Greene<br>Farleigh Wada Witt<br>121 SW Morrison St., Ste. 600<br>Portland, OR 97204<br>wgreene@fwwlaw.com<br>acolwell@fwwlaw.com<br><br>*Attorneys for Defendant Richard Doughty and Rev. Thomas Ries* | ☐<br>☐<br>☐<br>☐<br>☒<br>☐ | U.S. Mail<br>Facsimile<br>Hand Delivery<br>Overnight Courier<br>E-Mail<br>Odyssey File & Serve™ |
| Allyson S. Krueger<br>Elizabeth C. Knight<br>Conner C. Bottomly<br>Dunn Carney Allen Higgins & Tongue LLP<br>851 SW Sixth Avenue, Suite 1500<br>Portland, OR 97204-1357<br>akrueger@dunncarney.com<br>eknight@dunncarney.com<br>cbottomly@dunncarney.com<br>rhenderson@dunncarney.com<br><br>*Attorneys for Defendants Concordia University Foundation, George Thurston, and Chris Dunnaville* | ☐<br>☐<br>☐<br>☐<br>☒<br>☐ | U.S. Mail<br>Facsimile<br>Hand Delivery<br>Overnight Courier<br>E-Mail<br>Odyssey File & Serve™ |

/s/ *Thomas L. Hutchinson*
Thomas L. Hutchinson, OSB No. 994896
Laura Caldera, OSB No. 993786

Page 3– CERTIFICATE OF SERVICE