1        **IN THE UNITED STATES DISTRICT COURT**
         **FOR THE WESTERN DISTRICT OF TEXAS**
2                       **AUSTIN DIVISION**

3  THE LUTHERAN CHURCH - MISSOURI SYNOD,   ) AU:23-CV-01042-DAE
   *a Missouri non-profit corporation*,    )
4                                          )
      Plaintiff,                           )
5                                          )
   v.                                      ) AUSTIN, TEXAS
6                                          )
   DONALD CHRISTIAN, CHRISTOPHER BANNWOLF, )
7  JOHN DOES 1-12, CONCORDIA UNIVERSITY    )
   TEXAS, INC.,                            )
8                                          )
      Defendants.                          ) NOVEMBER 14, 2024
9  _____

10 CONCORDIA UNIVERSITY TEXAS,             ) AU:24-CV-00176-DAE
                                           )
11    Plaintiff,                           )
                                           )
12 v.                                      ) AUSTIN, TEXAS
                                           )
13 THE LUTHERAN CHURCH - MISSOURI SYNOD,   )
   *an unincorporated association of Lutheran* )
14 *Congregations*,                        )
                                           )
15 THE LUTHERAN CHURCH - MISSOURI SYNOD,   )
   *a Missouri non-profit corporation*,    )
16                                         )
      Defendants.                          ) NOVEMBER 14, 2024
17
               ********************************************
18                  TRANSCRIPT OF MOTIONS HEARING
                 BEFORE THE HONORABLE DUSTIN M. HOWELL
19             ********************************************

20

21

22

23

24

25

```
 1                          APPEARANCES

 2  FOR CONCORDIA UNIVERSITY:
                            CLARK WILLIS RICHARDS
 3                          RICHARDS RODRIGUEZ & SKEITH LLP
                            816 CONGRESS AVENUE, SUITE 1200
 4                          AUSTIN, TEXAS 78701

 5                          ALBERT A. CARRION, JR.
                            RICHARDS RODRIGUEZ & SKEITH LLP
 6                          611 WEST 15TH STREET
                            AUSTIN, TEXAS 78701
 7
    FOR THE LUTHERAN CHURCH - MISSOURI SYNOD:
 8                          STEVEN C. LEVATINO
                            LEVATINO PACE LLP
 9                          1101 SOUTH CAPITAL OF TEXAS HIGHWAY,
                            BUILDING K, SUITE 125
10                          AUSTIN, TEXAS 78746

11                          ANDREW F. MACRAE
                            MACRAE LAW FIRM PLLC
12                          3267 BEE CAVE ROAD, SUITE 107, PMB 276
                            AUSTIN, TEXAS 78746
13
    COURT REPORTER:         ARLINDA RODRIGUEZ, CSR
14                          501 WEST 5TH STREET, SUITE 4152
                            AUSTIN, TEXAS 78701
15                          (512) 391-8791

16

17

18

19

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.
```

```
1        (Proceedings began at 2:02 p.m.)

2             THE CLERK:  The Court calls AU:24-CV-176,

3   Concordia University Texas v. Lutheran Church - Missouri

4   Synod, et al., and 1:24 CV -- I'm sorry 1:23-CV-1042,

5   Lutheran Church - Missouri Synod v. Christian, et al.,

6   for a Motion Hearing.

7             THE COURT:  Thank you, Ms. Wallace.  Counsel,

8   if you'll state your name and who you represent.

9             MR. RICHARDS:  Dan Richards and Albert Carrion

10  for Concordia University Texas.

11            MR. LEVATINO:  Your Honor, Steven Levatino and

12  Andrew MacRae for Lutheran Church -- Missouri Synod.

13            THE COURT:  Good afternoon to all of you.  Let

14  me make sure I'm situated here.  I'll introduce you to my

15  team as well.  So Katherine Wallace is a courtroom deputy

16  in the clerk's office who is helping us out today, and

17  Natalie Beyer is my law clerk who has helped me in

18  preparing for this hearing and the other pending motions

19  we have in this case.  Natalie is a recent graduate of UT

20  Law School, so glad to have her in my chambers.

21            Okay.  So I typically start hearings by sort of

22  sharing my initial impressions from having read the

23  papers and what matters jumped out to me.  And so I'll do

24  that here.  I will preview for you that I am not going to

25  rule from the bench.  I typically do on these discovery
```

1  nondispositive motions.  But, here, given the pendency of

2  the referral of a dispositive motion, I think my plan is

3  to deal with the dispositive motion referral first and

4  then sort of see what effect that has.  But I wanted to

5  go ahead and set this for a hearing so we could talk

6  through some of these privilege issues that might have

7  bearing on production.

8           As for the arguments on the -- on the

9  discovery, what we've set today, I appreciate the parties

10  filing their joint advisory and conferring on the issues

11  that are teed up in these two motions -- three motions,

12  and reaching some agreement.  And I understanding you

13  have reached an agreement with respect to the subpoenas

14  to the former regents, according to the joint advisory.

15  Is that right?

16           MR. RICHARDS:  Yes, Your Honor.  I think we

17  would like, though, a court order just because they're

18  represented by separate counsel.  And so that way it's

19  cleaner.

20           THE COURT:  As for -- so it looks like it

21  really does boil down to, I mean, there's a lot of

22  categories of discovery at issue in the motion to compel

23  and the motion for protection.  But, obviously, the --

24  the RFRA and First Amendment privileges play into most if

25  not all of it.  That seems to be the take from the joint

1  advisory.

2          I know there was some arguments about some of

3  those privileges having been forfeited for failure to

4  have asserted them sooner or for failures to put them

5  into a privilege log in a timely manner, and I'm not

6  persuaded much by those forfeiture arguments.  And so I

7  understand they're part of the disputed matters here, but

8  I don't think the parties need to spend too much time

9  arguing about waiver, slash, forfeiture.

10         As for sort of the merits of the First

11  Amendment privilege, I guess one of the big questions I

12  have is, you know, I've read the cases and, in

13  particular, *Whole Woman's Health*, that Fifth Circuit

14  decision.  And it looked to me that the Circuit takes a

15  pretty permissive view of the extent of that privilege;

16  that it's -- that the Circuit seems to have applied it

17  pretty broadly.

18         With that said, the question that arose in my

19  mind is, well, if a lot -- and I get there are multiple

20  categories of documents being sought, and some of them

21  are maybe more closely related to ecclesiastical matters

22  than others.  But the question arose in my mind is, if

23  this weren't a religious-affiliated institution, then it

24  seems like a lot, if not all of this, would be

25  discoverable.  And it's -- the fact that we're dealing

1  with a university that's affiliated with a religious

2  institution, that that seems to shield what would

3  otherwise be discoverable matters.

4          And so I don't know where you draw the line in

5  terms of -- and, again, another thing, too, I guess,

6  unlike maybe what was at issue in the *Whole Woman's*

7  *Health* case is it looks like the bulk of these documents

8  are related to some governance type matters that, again,

9  but for the fact that they fall kind of within a

10 religious context, don't seem to implicate true, I guess,

11 ecclesiastical matters, I guess as the courts describe

12 them.  Some more than others, again.  And so I'm

13 interested in the parties' arguments and how that line

14 should be drawn.  Whether or not it goes to the breach of

15 fiduciary duty claim or other claims in the case, I don't

16 know that that makes much of a difference in terms of how

17 the privilege applies.

18          But, anyway, those are my initial musing.  And

19 we have two motions.  I guess the motion for protective

20 order was filed first.  And so, unless the parties have

21 discussed otherwise, I'll hear from Concordia first.

22          MR. RICHARDS:  If I may, Your Honor, too, I

23 think the arguments are essentially the same, and so I

24 didn't prepare two different arguments.  I'm just going

25 to get up here and yak and tell you what I think, and

1  it's up to you to sort it out.

2           THE COURT:  Okay.

3           MR. RICHARDS:  May it please the Court:

4           I represent Concordia University Texas.

5  Concordia operates a four-year college here in Austin,

6  and it currently has an enrollment of about 1400

7  students.

8           It's governed by an 18-member board of regents.

9  And, as you know, the hearing concerns discovery

10 disputes.  In particular, the first disputes concerns

11 three deposition subpoenas that were issued with about

12 50 items on *duces tecums* attached to three former board

13 of regents members of the university.  And I filed a

14 motion for protection.

15          In addition, there was written discovery served

16 on me, and the plaintiff has taken exception to my

17 responses and the time it's taken for me to respond and

18 the objections I've lodged.  And I think, as you

19 mentioned, I initially failed to state an objection.  I

20 think I stated it 40 days late, and they took issue with

21 that.

22          I know you have been provided extensive

23 briefing, and that was done by younger and smarter

24 lawyers than me, and I would request you rely on that

25 more than me.  And I know we're limited in time, but I'd

1  like to give you some context for the dispute and how we

2  got here.

3           Concordia was created as a nonprofit private

4  corp. in April of 1950.  The creation documents state

5  that it's to be governed by a board of trustees who are

6  elected in accordance with the rules of the Lutheran

7  Church -- Missouri Synod.  That's who's suing me here.

8           Over the years there have been various name

9  changes, there have been size of board changes, and

10 various kind of normal things that companies go through,

11 or entities go through, over 70 years.  However, the

12 board of trustees and regents have been elected in

13 accordance with the rules of the Lutheran Church for the

14 entirety of that time, up until 2022, at which time they

15 changed the bylaws.

16          And they essentially changed the rules and

17 regulations, they changed their bylaws, and they changed

18 their corporate formation so that they would separate

19 from the LCMS is what we call them.

20          I think it's important for the Court to know

21 that the board that voted to change and separate was a

22 board that was elected in accordance with the rules of

23 the Lutheran Church -- Missouri Synod.

24          For 70 years they endeavored to comply with the

25 rules and regulations of the LCMS.  Over the last five

1  years, three Concordia universities have failed and gone

2  out of business.  There's now only five schools remaining

3  in the system, and one of those is indisputably in such a

4  financial straits, it's going under this year or next.

5          In the face of these closures and an

6  increasingly competitive four-year university

7  environment, the LCMS proposed new rules under -- that

8  would govern our university as well as the others.  These

9  were proposed rules were called 703, and under 703 they

10  were going to create a new accreditation agency.  That

11  agency was going to decide whether the university was

12  sufficiently compliant with the LCMS religious tenets.

13  They were going to require the primary focus to be

14  training of church workers.  The rules would give the

15  -- Missouri Synod say in the selection and qualification

16  of the regents.  And if anyone wanted to change the rules

17  or the creation documents, they would have to get

18  permission from the LCMS.

19          We were invited to comment, and we did.  And

20  we -- we're invited to visit with them, and we gave

21  multiple, lengthy comments, all of which were ignored,

22  and none of the rules -- or proposed rules were changed.

23  And so, absent some kind of substantive dialogue, the

24  LCMS -- with the LCMS, in November of '22 the board of

25  regents voted to separate and to change the articles of

1    incorporation policy handbook and the bylaws.

2            The case before you -- and I think you know

3    this -- is an attempt by the LCMS to either undo what we

4    did in November '22 or get damages as a result of what we

5    did.  And I've met with Mr. Levatino and Mr. MacRae, and

6    like we told you, we think, essentially, this discovery

7    dispute hinges on the First Amendment and Religious

8    Freedom Restoration Act.  And if we could get guidance

9    from you on that, the rest of it kind of falls out from

10   there in terms of discovery.  And so I think that's why

11   we got to where we did.

12           The primary information they're trying to

13   receive from us is to discover the individual identities

14   of the 12 regents that voted in favor of separating from

15   the LCMS.  Just so the Court knows, I don't have an

16   attorney-client relationship with each of them.  I have

17   reached out to them for their files.  I have even reached

18   out to them to find out if they want to disclose how they

19   voted.  And, as you might imagine, it has varied.  Some

20   of them have given me their files.  Some have told me

21   they don't want to talk to me at all.  So I can't, even

22   if you force me today, tell you how they voted.

23           Secondarily, they'd like to discover all the

24   communications and documents that led up to the vote and

25   any subsequent discussions or communications regarding

1  the reasons for the vote.  And as I've stated to the

2  Court, I believe, under both the First Amendment and the

3  Religious Freedom Restoration Act, that those are

4  privileged communications, and the identities of the

5  individuals who voted are also privileged.

6          You mentioned the *Whole Woman's Health* case.

7  There's always *Perry v. Schwarzenegger*, which is Ninth

8  Circuit, but actually does a far more detailed kind of

9  analysis of these issues.  And both of these cases draw a

10  long line of Supreme Court cases governing First

11  Amendment Religious Freedom.

12          The *Whole Woman's* case states that the analysis

13  required requires three conditions of me: one, a sincere

14  claim of religious belief.  And I don't think these

15  gentlemen dispute, and I don't think the LCMS disputes,

16  that we are a religious organization and have a sincere

17  claim of religious belief.

18          The second thing they require is I need to show

19  a substantial burden that disclosure would impose on me,

20  and then whether they or the government could show a

21  compelling need for the information.

22          Both *Schwarzenegger* and *Whole Woman's Health*

23  say it is self-evident that the disclosure of internal

24  communications would have a chilling effect and would be

25  a violation of the First Amendment.  The courts go

1    further to say that requiring disclosure of such

2    communication would inhibit internal email use, as well

3    as other forms of communication.  So I think I meet that

4    hurdle.

5         We're making the same argument today.  I have

6    submitted to you two declarations.  One is Dr. Donald

7    Christian, who is the president of Concordia University.

8    He's been the president for a long time.  And the other

9    is Dr. Stephen Sohns, the board president of Concordia

10   University Board of Regents.  He came on as president --

11   although he's been on the board, he came on as president

12   of the board relatively recently.

13        Both of them confirmed that compelled

14   disclosure would make it difficult for them to operate

15   their organizations.  It would make them not rely on

16   email.  It would make them not rely on written

17   documentation.

18        THE COURT:  Is it your contention that every

19   communication by the regents -- set aside this dispute

20   and to what extent this rift between the church

21   organization and the university organization has happened

22   and that that is the genesis of this lawsuit, right?

23        But what if instead the -- Concordia is sued

24   for breach of contract by the paper-shredding company or

25   something that comes to campus, you know, every week.

1   Can you assert a First Amendment privilege there, because

2   those are communications -- communications between the

3   regents and the -- you know, the facility's people with

4   respect to this operational thing if a campus is at a

5   religious university.

6           MR. RICHARDS:  I can't withhold the contract.

7   I don't contend that at all.  And I can't withhold

8   whether or not I've made payment under the contract or

9   somehow canceled the contract.  I don't see how I could

10  possibly argue that.

11          I do see, if the board sat around and said,

12  hey, what do you think about paper shredder A versus

13  paper shredder B?  I think that probably is privilege.

14          THE COURT:  As a First Amendment privilege?

15          MR. RICHARDS:  I believe it is.  Because I

16  think --

17          THE COURT:  Freedom of association privilege or

18  free exercise?

19          MR. RICHARDS:  I think it's probably both, but

20  I think it's discussion of how they're going to operate

21  their religious entity.  So it's more religious

22  privilege.

23          THE COURT:  Okay.

24          MR. RICHARDS:  And I think in a case similar to

25  this --

```
1              THE COURT:  Well, let me ask a follow-up
2    question before you get to that.
3              MR. RICHARDS:  Please.
4              THE COURT:  Because I think analogies -- I do
5    want to hear the analogy you want to make to another
6    case.  But let's say it's not Concordia University but
7    it's some -- well, some private operated, not a public
8    school, you know.  Well, let's say it's UT or some
9    private school but not a religiously affiliated private
10   school.  Then those things would -- those documents
11   related to the paper shredder would be discoverable.
12             MR. RICHARDS:  As far as I know, they would be,
13   but I haven't gone and researched that.  I wasn't, you
14   know, representing them.  But I think the religious
15   affiliation, clearly, if I read the case law right,
16   provides a much stronger privilege than a private entity
17   enjoys.
18             THE COURT:  For everything?  Because there's
19   no -- I mean, there's no argument -- and paper shredder
20   was just an example of a contractor that I picked.  But I
21   don't think anyone can argue that an organization's
22   decision with respect to a vendor like that, whether it's
23   a church-affiliated university or the Church itself,
24   would -- that bears on religious policy, right?
25             MR. RICHARDS:  Agreed.  But I think it bears on
```

1  the governance.  And, as you stated, and I think you're

2  right, the way I read the case law is:  If it's religious

3  in how you govern the entity, then all of sudden it comes

4  under the privilege.  I think that's odd in the paper

5  shredder argument, and I don't disagree with you on that.

6        And I might state we're 501(c)(3) or whatever

7  we are, we're a nonprofit.  We have to produce all kind

8  of stuff.  So we don't claim privilege to our finances.

9  We don't claim privilege to a bunch of stuff, because

10  we're required by other laws to produce those things as

11  well.  So I have not dropped a cloak over the entirety of

12  the organization.  And they have requested, and I have

13  produced, financial records and things of those nature.

14        THE COURT:  Then going back to the more

15  immediate -- I mean, the example of this case that we're

16  talking about here, is there not a difference -- when I

17  think of church governance, the Lutheran Church, they've

18  got -- I don't know exactly what the internal, you know,

19  structure is, but, you know, there are -- maybe there's a

20  bishop or priests.

21        MR. RICHARDS:  Correct.

22        THE COURT:  And within each parish there are,

23  you know, laypeople who are on the board of vestry or

24  whatever.  And that is truly governance of the church's

25  organization.  And I think that's clearly within what's

1   being contemplated by the privilege as it's been

2   discussed in the case law.

3           But it seems to me like, when you move into the

4   governance of a university, yes, there are some religious

5   elements to some of what -- how those decisions are made.

6   But it seems like we're getting more secular when we're

7   talking about the operation of a university, at least

8   with respect to some of what they do.

9           MR. RICHARDS:  I think you're correct.  We are

10  more secular.  I don't think we are more secular in the

11  issue we're dealing about in this case.  But certainly if

12  I'm an employee of the university and I have a claim

13  against the university, that is far more secular, and I

14  don't agree with the church dictating to me the religious

15  way I'm going to operate, and I've elected to separate.

16  To me that is very much religious *[inaudible]*.

17          THE COURT:  What about -- well, I mean, I guess

18  part of your argument with respect to, for example,

19  there's lots of categories of documents and I think it

20  could be parsed.  I don't know that it has to be a

21  blanket holding here.

22          MR. RICHARDS:  I agree.

23          THE COURT:  It could be.  It would be a lot

24  easier for me if it were if I just said, yep, all

25  privileged or no privilege.  But I think that the more

1  prudent approach here is going to involve some parsing.

2  But, either way, the select -- I guess with the selection

3  of the -- in the category of the selection of the

4  board -- the members of the board of regents, that's --

5  there is an element, right, like, partly because some of

6  them have to be drawn from various parts of the church

7  organization.  And there is a declaration, am I right, by

8  them, that they're going to be truthful or faithful to

9  the tenets of the Lutheran Church; is that right.

10        MR. RICHARDS:  Yes.  Maybe I could help this

11 way:  Given that we were supposed to argue this in 30

12 minutes each, I think we both decided we would spend our

13 time on how did they vote.  And I realize that doesn't

14 answer all the questions.  And Steven and Andrew

15 understand that as well.  We just thought we got that

16 issue resolved, because a lot of the questions are tell

17 me how they voted, tell me how they voted, in different

18 ways.

19        I agree with you.  There are different things,

20 which are, well, then what were the memos that were sent

21 in between, before that and after that.  I don't think

22 any of us thought you wanted us to come up here and go,

23 you know, Request For Production 1, 2, 3, 4.  We just

24 kind of need some guidance on how they voted.

25        Now, if I may, on how they voted, it really hit

1  me differently.  Like I said, I don't represent the ones

2  that are essentially named as John Doe.  I got concerned

3  that, one, not only does CTX have a privilege, the

4  university, but also those individuals do.  And so that's

5  how I kind of headed down this path of, wait a minute,

6  essentially what they want me to do is tell them John

7  Doe's name so he can be sued for $100 million.

8         And I thought I'm not sure that I, Dan, as the

9  lawyer can do that or, two, my client CTX can do that.

10 And then if you look at the record, you'll realize they

11 had the vote confidentially intentionally for this

12 purpose, because of concern about retribution from the

13 Church.

14        And so it's not like these are board members

15 for a big church that has jets and stuff.  Our guys are

16 all volunteer board members.  Most of them are pastors or

17 retired pastors.  They don't get paid.  They don't get

18 some perks.  And, essentially, they're voting their

19 conscience.  They're voting their religious belief.  And

20 what I'm being asked is to disclose their names so they

21 can be sued.

22        And, to me, that's almost a higher level

23 because I'm waiving not only CTX privilege but their

24 privilege for service on the board.  And so later in my

25 argument I argue they can't have conflicting fiduciary

1  duties.  They clearly owe a duty to Concordia University,

2  because that's the board that they're on.  But the case

3  law I cited says you can't have a conflicted fiduciary

4  duty.  Your fiduciary duty is for the corporation or

5  entity whose board you are on.

6          Secondly, they can't be sued for something they

7  did in good faith, unless it is shown they did it in bad

8  faith or it was against the interests of Concordia

9  University.  And so the idea that somehow the LCMS can

10 say you owe me a fiduciary duty, even though Texas law

11 doesn't recognize it, and I'm going to see you for that,

12 even though your duty is to do the best for Concordia, I

13 think the argument for me is easier on these than kind of

14 the plethora of documents and fighting about which

15 documents get disclosed.  So this all got jammed up on

16 the disclosure of who voted how and trying to discover

17 that.

18          THE COURT:  Well, I mean, on that point,

19 though, I think LCMS is going to say, well, as it stands

20 here today, we have a current, live pleading asserting

21 the breach of fiduciary duty.  And you haven't won on

22 your motion to dismiss yet, and so until that part of the

23 case is carved out, we can get discovery on it.

24          MR. RICHARDS:  They say that, but the fiduciary

25 duty they cite to is an ecclesiastical fiduciary duty.

1  They don't cite to a state law fiduciary duty or a

2  federal law fiduciary duty.  They say, hey, we created a

3  fiduciary duty, and you guys breached it.

4         Well, I don't -- with all due respect, I don't

5  think this Court enforces that.  The ecclesiastical court

6  can.  They can excommunicate them.  They can admonish

7  them.  They can censure them.  But they don't get to come

8  here and say we found breach of fiduciary duty.

9  Judge Howell, please fine them $110 million.  That's not

10 how it works.

11        And so because these cases say you as the judge

12 have to do a very exacting scrutiny of the need for the

13 information, my position is they don't need this

14 information because there's no valid case, no valid

15 claim.  And I realize that is a summary judgment

16 argument.  But if we wait 'til summary judgment, the

17 damage is already done.  All these guys get sued, nobody

18 wants to serve on my board, and my university fails

19 because we went ahead and invaded the First Amendment

20 privilege.  That's the reason this has gotten to kind of

21 the loggerheads it has.  And so that's the argument I

22 want to make.

23        THE COURT:  What is -- you kind of rattled them

24 off earlier, and I think I generally have an idea.  But

25 when you say how they voted, we're talking about these

```
 1  bylaws amendments that occurred in was it November of
 2  2022?
 3          MR. RICHARDS:  Yes, sir.
 4          THE COURT:  And what specifically were those
 5  amendments again?
 6          MR. RICHARDS:  I didn't read out the amendments
 7  to you.  But, essentially, what they did was they said
 8  we're no longer going to select our board members in
 9  accordance with the LCMS bylaws and various other bylaws
10  that essentially said the same thing.
11          I don't think there's a dispute between
12  either -- either side that the intent and the reason was
13  to separate from the LCMS and not be subject to its new
14  proposed rules which were being proposed.  I mean, I
15  could get them all for you, but it's bylaws and they're
16  dull.
17          THE COURT:  Right.
18          MR. RICHARDS:  If I may?  I don't want to
19  interrupt.  If you've got more questions, I'll pretend I
20  know the answers.
21          THE COURT:  I might, but you go ahead.
22          MR. RICHARDS:  I'm going to get off my speech.
23  I'm sure there was something important I'm supposed to
24  say.  But I think, because it's First Amendment
25  privilege, and because it's a religious institution and
```

1  that whole Religious Restoration Act, the courts have

2  been, like you said, extremely broad in applying and

3  they've said you have to use exacting scrutiny.

4           I think if they were saying they were here

5  because they were going to sue us on negligent infliction

6  of emotional distress, you would consider whether that

7  was a good enough reason to identify the names of these

8  board members.

9           My contention is they said they're going to sue

10 us on a fiduciary duty that they have created, not one

11 that this Court created and not one that comes under

12 state or federal law.  And I think under exacting

13 scrutiny, you need to look at that.  I don't blame them

14 for making the argument.  That's not it at all.  I just

15 think, given what they're asking us to disclose and given

16 the devastating effect it has on the university's ability

17 to get volunteer board members, if the last dozen or half

18 a dozen get sued, it's important to make the decision now

19 as opposed to at summary judgment.

20           THE COURT:  Well, I had a question.  Let's see.

21 Oh, yeah.  One of their arguments is *Perry* and *Whole*

22 *Woman's Health*, they're not the same because we're sort

23 of all part of the same family.  We're a Lutheran Church.

24 Either a Lutheran University that we chartered and

25 supported.  And so we're just trying to get information

1  from something that is part of us because they wrongly

2  tried to break from us.

3          And so *Whole Woman's Health* and *Perry*, they're

4  different, because you had true adversaries in those

5  cases trying to seek documents, one adversary against the

6  other.  And that's not what we have here.  Why are they

7  wrong about that?

8          MR. RICHARDS:  Well, one, I saw the argument,

9  and I just didn't get to that part pause I forgot where I

10 was on my pieces of paper.

11         One, I didn't see any case law that says,

12 because we are friends or long-time relationship

13 entities, then that waives our First Amendment privilege.

14 They don't have any law on it.  I do think there is a

15 long history with the Lutheran Church of churches

16 separating.  I mean, that's how this church was

17 originally created.  And so the idea that somehow you

18 cannot separate because you were with us last year and so

19 you're always with us forever, that seems to be what the

20 argument is.  And I don't see any case law supportive of

21 that.

22         Another point I'd like to make is this:  Either

23 the board had the power to make this decision or they

24 didn't.  And that's going to be decided by the governing

25 documents of my board and the title documents for the

1    university.

2           How or whether one person voted one way or not,

3    or why they voted one way or not, really isn't going to

4    drive that.  If we didn't have authority to do what we

5    did, they're going to take our campus back, they'll kick

6    all these guys off the board, and they'll run the

7    university.  If we did have authority to do what we did,

8    then they don't get to take our campus back and kick us

9    off, and we get to run our university.

10          My impression is that suing the individual

11   board members and sending subpoenas and sending stuff

12   like this, it is less towards getting to the real issue,

13   which is:  Did we have authority to do it or not?  And I

14   think that's about a four-document case.  I don't think

15   it's a 50-subpoena *duces tecum* case.  So I think that's

16   important when you're deciding their need for the

17   information.

18          To what extent -- maybe this -- this sort of

19   decision-making rubric doesn't start to apply until we

20   actually get to the merits of what's at issue in this

21   lawsuit.  But the Texas Supreme Court in *Masterson and*

22   *the Episcopal Churches* where they decided, all right,

23   we're going to apply neutral principles to matters of

24   governance, ultimately, I guess that's a decision that

25   would apply to the merits of the lawsuit but doesn't

1  necessarily bear on the First Amendment privilege

2  question; is that right?

3        MR. RICHARDS:  It doesn't.  But my argument is

4  that's where you are.  You have to apply neutral

5  principles.  Which means, I think, or I believe, you

6  aren't to interpret or pursue ecclesiastical remedies.

7  And, essentially, their pleading says we've already

8  decided.  It says we've already decided and we're seeking

9  you, this court, to enforce their decision that Concordia

10  did something wrong.  And my position is, no, we didn't

11  do that, Your Honor.

12        So I think neutral principles argument goes my

13  way.  Now, if Concordia, like you said, had a contract

14  with a paper shredder that they signed and they said,

15  hey, you know, we're not going to pay you, neutral

16  principles can handle that.

17        This same entity is in a lawsuit up in Oregon

18  or somewhere over a university that signed a contract,

19  and they're in huge fight.  And the LCMS is saying, oh,

20  no, wait.  That's the university's problem, not our

21  problem.  We aren't associated.

22        So to me it's a little disingenuous to come

23  here and say, oh, no, we own your entire campus, but we

24  have none of the responsibilities that you have.  And so

25  I -- I understand they have to make their argument, but,

1  ultimately, this comes down did we have the authority to

2  do what we did.  And that's how the case ought to be

3  tried.

4          THE COURT:  Anything else you'd like for me to

5  consider before I hear from Mr. Levatino?

6          MR. RICHARDS:  Probably.  But not that I can

7  remember.

8          THE COURT:  Very good.  Thank you.

9          MR. RICHARDS:  Thank you.

10          MR. LEVATINO:  May it please the Court:

11          Your Honor, Steven Levatino for the LCMS.  This

12  is *déjà vu* for me and Mr. MacRae.  About five years ago

13  we were in this courtroom arguing the *Whole Woman's*

14  *Health* case for the Texas Catholic Conference and

15  Catholic bishops.  And that was our case, and we are very

16  familiar with that case.  And we picked up on something

17  that is very important on all of this.

18          This *Whole Woman's Health* was a case involving

19  a third party that was unaffiliated with the Church in

20  any way seeking internal communications of the church

21  bishops.  *Perry* is a nonreligious case.

22          Mr. Richards points out that we had not pointed

23  to any case law that talks about an internal church

24  governance fight on the First Amendment.  And that's true

25  because there is no case on that.  And so *Whole Woman's*

1  *Health*, when we were arguing that at that time, that was

2  the first case that really touched on that issue for a

3  church from a third party.

4          So we're talking about new law.  It does flow

5  from *Masterson*.  They wouldn't have done this, I don't

6  think, if the *Masterson* case had not happened.  But it's

7  there, and I'm going to talk about that later in my

8  argument.

9          THE COURT:  I just want to ask you a question

10  about that first point, though.

11          MR. LEVATINO:  Yes, sir.

12          THE COURT:  As I framed the question to

13  Mr. Richards, maybe I'm over simplifying it, but in your

14  distinguishing *Whole Woman's Health* from this case, it's,

15  look, we're all part of one larger organization and how,

16  you know, it -- but for the purposes of this case and for

17  the purposes of sort of scrutinizing the discovery

18  question here, I mean, Concordia has essentially declared

19  its independence from the Church and -- and I think sees

20  itself as adversarial now.  I mean, obviously, you're on

21  opposite ends of the "v" in a lawsuit in federal court --

22  two lawsuits in federal court.

23          I think Mr. Richardson didn't necessarily make

24  this argument in the same words, but I think they would

25  say we are separate and we are adversarial.  So we are

1  like the two parties who were against each other in *Whole*

2  *Woman's Health*.

3          Now, the Lutheran Church sees it differently

4  and maybe sees the acts of our board as, you know,

5  illegitimate or whatever, or in breach of a fiduciary

6  duty.  But, either way, as we are here before the court

7  right now, and as this case is pleaded, for our purposes

8  we are separate and we are adversarial.

9          And so why, if that's true, maybe I -- why

10  wouldn't *Whole Woman's Health* look a lot like this?

11          MR. LEVATINO:  Your Honor, we don't take the

12  position that they're separate from us.  We believe that

13  Concordia University is a LCMS university, is an agency

14  of the LCMS.  It is our agency.  They took --

15          THE COURT:  Well, let me challenge that premise

16  real quick.  And I know you're about to add to it, but --

17  and I think this does kind of come up in the briefing.

18  But isn't that a question of the -- doesn't that go right

19  to the merits of the case?  I mean, is it not -- I mean,

20  if ultimately Judge Ezra decides that Concordia's bylaw

21  amendments were lawful, then what -- your premise that

22  you're giving me is not necessarily accurate, right?

23          MR. LEVATINO:  I would rephrase it in that, as

24  opposed to CTX, this understanding of what they believe

25  their governance documents, is we believe that the

1   governance of this university is much broader than just

2   their bylaw and their charter and their policy manual.

3          It specifically brings into their governance

4   the LCMS constitution and bylaws.  That was specifically

5   in their charter.  That was specifically in their bylaws.

6   That was specifically in their policy manual.  And, most

7   importantly, had they done that, had they followed the

8   LCMS constitution and bylaws, they would have followed

9   the rule that says you have to get authority to amend

10  your bylaws and charter from the LCMS before you do it.

11  And they just skipped over that.  They didn't -- maybe

12  they didn't know about it.  They just looked to their own

13  bylaws and said we can amend here and we move on.

14         So they basically brought in the LCMS

15  governance documents, the ecclesiastical documents as

16  they're calling them.  They became part of the governance

17  of a secular entity that they were required to follow.

18  And what separates this case from the *Masterson* case is

19  we're not sitting here arguing that this is -- if you

20  look at the *Masterson* case in detail, what the Episcopal

21  Church did in that case, it's because that was where the

22  law was at the time.  They claim that it was a deference

23  to the bishop of the Episcopal -- the governance of the

24  Episcopal Church, whether the Church could leave with the

25  property.  Okay.  They used the deference approach.

1          That was the law that was allowed in Texas at
2    that point.  The court came back with, no, this is a
3    neutral principles argument, and the Episcopal Church
4    didn't make an argument on neutral principles.  And,
5    therefore, they can't go forward, because we're saying
6    this a neutral principles case.
7          I'm going to be arguing in this case that,
8    pursuant to neutral principles, just follow the
9    governance documents that are applicable to the
10   university, they did an act that is void.  They shouldn't
11   have done what they did, and it needs to be reversed so
12   the LCMS can have board members in there that follow the
13   governance documents of the entity.
14         What I think is real important for the Court to
15   understand on this is this is not -- this is not an
16   entity that was just created recently and the board
17   members decided, you know what, we're going to go a
18   different way.  The LCMS created this university
19   specifically for the education of church workers within
20   the LCMS in 1926.  It was a specific agency of the LCMS.
21         And I think it's an important distinction that
22   you need to understand in the governance of this church.
23   This is -- you mentioned earlier the terms "bishop" and
24   "priest."  The LCMS is organized differently than like
25   the Roman Catholic Church.  It is a Synodical Conference,

1  okay?  It's a synod.  And what that is is the members of

2  that synod are all the congregations throughout the

3  world, of several millions -- I mean several thousands of

4  congregations that form this Synod.

5          Behind those congregations are millions of

6  Lutheran - Missouri Synod members, right?  They come

7  together right not in synod every two to three years and

8  they -- they pass rules applicable to the entire church.

9  And that is how they do their governance.  They've given

10 authority to a president, not a pope or a bishop.  It's

11 the president of the synod, and the board of directors of

12 the synod, to create certain entities.

13         Those entities include agencies which include

14 universities.  So the synod itself created this

15 university.  They themselves established the original

16 governance of this university.  They themselves placed

17 the board members of this university, and they did that

18 as an LCMS unincorporated entity from 1926 to 1952.

19         At that point -- and we have evidence of this

20 in our first amended petition -- in order to assist the

21 university in working with civil society, they allowed

22 them to organize as a nonprofit corporation.  But if you

23 look at it, it was set up specifically as a trust.  It

24 was being given to them in trust by the LCMS.

25         And the -- the rules of the Synod and the

1   governance documents specifically stated that those LCMS

2   members, that they were -- that they agreed -- or LCMS

3   board members -- I'm mistaken there.  That CTX board

4   member took their positions saying they would be subject

5   to the LCMS rules of the synod.  That includes the

6   bylaws.  That includes the constitution.  The bylaws

7   state that the members must follow the Synod Conference

8   constitution and bylaws.

9          Those bylaws indicate that they owe a fiduciary

10  duty to the conference.  I would indicate that we're not

11  only saying an ecclesiastical fiduciary duty, we've also

12  pled a common-law fiduciary duty, because these people

13  were placed in the position by the Church as special

14  relationships.  They're going to sit on that board to

15  take care of their university in a civil way, with

16  society, on behalf of the synod.  And that happened from

17  1952 to 2022.

18         So for nearly 70 years the boards of the CTX

19  University followed this dual governance situation where

20  they have the bylaws of CTX, they have the charter of

21  CTX, they have the policy manuals of CTX.  But they also

22  at the same time, they have the LCMS bylaws and

23  constitution that they're following as part of their

24  governance.

25         And they're crossed together, this one whole

1    unit of governance.  And what they're trying to do is

2    tell you to get rid of one side of the governance

3    equation, and I'm going to ask you not to do that.

4              THE COURT:  All of this is very good summary

5    judgment argument, right?  But what I still haven't heard

6    is why CTX doesn't enjoy -- CTX or its board members

7    don't enjoy First Amendment protection, whether that's --

8    or a privilege under RFRA, because if -- if everything

9    you told me is exactly how the court adopts -- if the

10   court adopts the same reasoning, you win, right, on

11   summary judgment?

12             And if Judge Ezra ultimately at trial decides

13   that Mr. Richards', you know, articulation of the

14   corporate -- the effect of this governing structure and

15   the bylaws and amendments and whatnot, that his version

16   of it is right, then he wins on summary judgment.

17             But, either way, that's not an answered

18   question right now, who had authority and who doesn't.

19   But the question in the context of -- that we kind of

20   narrowed it down for the purposes of this hearing as to

21   who voted and how they voted on these bylaw amendments,

22   who's right ultimately on the merits I don't think bears

23   that much on who enjoys a First Amendment or RFRA

24   privilege here and how that should apply to this

25   discovery.

1          MR. LEVATINO:  I see what you're saying here.

2   What distinguishes this is the Church is seeking

3   information from its own church members, in effect.

4          This is --

5          THE COURT:  Well, okay.  Let's say -- so I'm a

6   member of St. David's Episcopal Downtown.

7          MR. LEVATINO:  Sure.

8          THE COURT:  And if the board -- the vestry

9   board got upset with me for whatever reason and they

10  wanted to serve discovery on me, sue me -- sue me for

11  whatever reason and seek discovery from me, are you

12  saying that I don't have a First Amendment privilege

13  against disclosing information because I'm a member of

14  that church?

15         MR. LEVATINO:  You don't have a First Amendment

16  right to hide behind it to -- to do an act that is

17  against the teachings of the Church.  To use your example

18  with the vestry, it would be like if the vestry showed up

19  at its meeting next Monday, and they got there and there

20  was a sign out front that said it's now First Baptist

21  Church, and the minister decided on his own that it was

22  First Baptist Church.  And he's not calling himself a

23  priest anymore.  Now he's saying he's a pastor.  And he's

24  also changed all the locks, okay?

25         That board is then going to sue the pastor for

1    doing *ultra vires* acts.  And they're probably going to

2    send discovery that says:  What gives you the authority

3    to do this?  They're probably going to send discovery

4    that says:  Who did you talk to about this that told you

5    it was okay?  They're going to send all sorts of

6    discovery, and he's going to come back and say, Sorry.

7    King's X.  First Amendment protects me from doing that.

8           That's what we have here.  To put the same --

9    put that in the context of your own faith, that is what

10   is going on here.  In our discovery we have filed a claim

11   for breach of fiduciary duty specifically to find out who

12   did this, because we believe they breached their duty to

13   the LCMS when they did that.  And we have the right to

14   know their name.

15          Them disclosing who they are that voting yes or

16   no is not a First Amendment-protected act.  It has

17   nothing to do with their belief or their faith.  It has

18   to do with how they treated the governing documents and

19   disregarded one-half of their -- their ecclesiastical

20   governing documents.

21          THE COURT:  I think you would -- so you agree

22   that the First Amendment privilege in this context is not

23   absolute, right?

24          MR. LEVATINO:  Absolutely.

25          THE COURT:  And that it's subject to this sort

1  of -- it's a three-part analysis.  Sincere belief, which

2  I don't think is in dispute here, but then what is it?

3  Substantial burden and substantial need?

4          MR. LEVATINO:  You're correct.

5          THE COURT:  Essentially, what it comes down to

6  is the burden on their First Amendment or Religious

7  Freedom Right Act rights versus the need for those

8  documents and how -- that whatever *[inaudible]* you're

9  seeking.  Am I right?

10          MR. LEVATINO:  I would agree with that.  And no

11  matter what part of the test you come in on, step two or

12  three, I think we win.  We agree that this is a First

13  Amendment question.  We don't agree whether they have a

14  First Amendment right.  Okay.  So they have to establish

15  that.  That's their burden, is they have a First

16  Amendment right to avoid telling us who took this act

17  that took this university out of -- out of the LCMS

18  Church.  That's what they want to claim.

19          We say that's a void act and they're not out of

20  the Church.  Okay.  If they establish that burden, then

21  it comes back to us to show that we have a compelling

22  need to know the information.  We absolutely do in this

23  case.  We absolutely need to know who are the people that

24  are trying to strip this 100-year-old institution away

25  from the Church.  Who are these people that decided that

1  they were going to disregard one-half of their governing

2  documents.  That's all we're asking on a lot of these

3  questions, and that is the gist of it.

4          I think it is so compelling, because if this

5  was allowed to occur, the -- the normal governance of

6  churches would break down, because people could just do

7  whatever the heck they wanted and then they would argue

8  First Amendment prevents you from looking into what we

9  did.

10          And so I would -- I would just generally

11  request the Court to look at this as a context of a

12  church trying to provide governance to the LCMS Synod and

13  its agency, CTX.

14          THE COURT:  So one of the, I found to be pretty

15  compelling, burden concerns and the exacting scrutiny I'm

16  supposed to apply here -- because it's a sensitive thing

17  when we're talking about an individual board member's or,

18  you know, an organization's freedom of association,

19  freedom of exercise -- free exercise rights.  One of the

20  things that Mr. Richards urges here, or CTX urges, is if

21  we're required to disclose the information that RCMS is

22  seeking, then we are necessarily -- it has a chilling

23  effect both on people who remain part of the organization

24  to speak freely about these matters and also our ability

25  to recruit new board members, as, you know, the papers

1   show board makes resigned as these debates went on and

2   some of these rows were had, because nobody is going to

3   want to be on this board if they're subjected to being

4   outed and sued.  And, ultimately, that goes to the very

5   heart of what the First Amendment is trying to protect

6   when it's -- when that right extends to this context.

7           And so -- and let me add one more to it before

8   you contemplate the scenario.  And that's why -- and what

9   I was looking at on my computer screen, what I was

10  pulling up, was your first amended complaint.  And I was

11  looking at the causes of action, and you keep referring

12  back to the breach of fiduciary duty claim, because it

13  seems like part of the argument here is you don't -- so,

14  we have all these important concerns and rights,

15  constitutionally guaranteed rights, bound up in this

16  request.  And so the court should only compel this

17  disclosure if it's truly necessary, right, if there's a

18  substantial need, and it just can't be gotten from

19  anywhere else.

20          And here what we've got is most of this legal

21  fight is about whether or not we had the authority to act

22  in this way or not.  Well, we did act in this way, and so

23  you don't need to know who voted how and in what way.

24  And you can determine whether we were in conformance with

25  whatever governing documents the court determines govern,

1  with or without a vote count or a head count.

2         And so in the back of my mind, this question

3  of, if the only reason you need the disclosure of who

4  voted how is to support this breach of Friday duty claim,

5  well, then maybe I should look at that circumspectly.

6  Maybe I should think, well, if this is an ecclesiastical

7  duty imposed by -- that's not necessarily a common-law

8  duty.  Maybe we should take a closer look at that claim

9  in this context.

10         MR. LEVATINO:  Okay.

11         THE COURT:  Are there other reasons why you

12  need to know those voters and how they voted?

13         MR. LEVATINO:  So the first part of your

14  question is why.  These board members knew what they were

15  signing up for when they accepted the position, and they

16  knew that they were accepting the position to be on the

17  board of CTX, subject to the rules and regulations of the

18  Lutheran Church, which includes its constitution and

19  bylaws.  So they signed up for this, okay?  They were

20  given a sacred position on behalf of the synod to run

21  their agency, the university, in a way that was, for 100

22  years, believed by the Church to be pursuant to the

23  bylaws and constitution of the Church.  So, yes, they

24  signed up for it.

25         I think it may be not exactly similar, but

1    there are case law -- there is case law where churches

2    have gone in front of a church congregation and said, you

3    know, our minister did this, and then the minister sues

4    the -- the church for defamation.  And those have been

5    dismissed on ecclesiastical extension grounds, saying the

6    minister, when they get involved with the church, they

7    know what they're signing up for.  And that includes the

8    church being able to govern itself as it sees fit.  So

9    this is abstention -- ecclesiastical abstention case in a

10   way, and it will come up on the merits.

11          What happened in this case since they took this

12   action is the LCMS Synod and its highest ecclesiastical,

13   I'd call it a court, have told the Church, have decided,

14   that what they did was against the bylaws of the Church

15   and is void.  Okay.  So that's going to come to the Court

16   at some point.  The Church has said that they -- they

17   didn't follow our law.

18          You're not going to be asked to interpret

19   anything.  You're going to be given what they interpret

20   that they did, and it's going to be that they did not

21   follow the bylaws.  So you're not going to have to get

22   involved in ecclesiastical matters.

23          The rest of your question I'm lost on now, so

24   if you could restate it.  I apologize.

25          THE COURT:  Well, it's I guess, going back to

1  the who -- you know, information about who was on the

2  board and how they voted, and maybe I guess you would

3  challenge the premise that there's no First Amendment

4  protection of that information in the first place.  But,

5  let's say I conclude that this falls within the idea of

6  sort of governance type matters that is contemplated in

7  *Whole Woman's*.  Is the only cause of action that that

8  information will be relevant to, your breach of fiduciary

9  duty claim.

10           MR. LEVATINO:  That is what we have pled.  If

11  you look at how we pled the cause of action, we say who

12  it's against.  And that's who we claim that claim is

13  against, is the John Does 1 through 12.

14           We don't want to sue the wrong person, right?

15  We're not going to sue somebody if they voted against us.

16  But what they're compelling us to do is that we have a

17  pleading deadline on December 2nd.  And that's an

18  agreement that's come between the parties.  December 2nd

19  is our day to do that.  And what we've been trying to do

20  in good faith is find out who did this so we can name the

21  right party to the litigation.

22           Mr. Richards pointed out that, you know, in

23  order to do a fiduciary duty claim, he -- I haven't

24  checked this yet, but his view is that we would have to

25  establish bad faith against interests, and we don't --

```
 1  we're -- and he says they didn't do that.  We don't
 2  concede that.  That's why we need this information.  We
 3  want to see how -- how egregious was their act.  Did they
 4  know that they were violating the synod bylaws and
 5  constitution when they took this act.  That would be
 6  evidence of bad faith on their part.
 7          We don't concede like they claim that there
 8  isn't a fiduciary duty between the CTX board members and
 9  the LCMS.  We allege that it does exist.  It exists
10  within their governing documents, and it also exists
11  under Texas common law.
12          And so what we're being asked to do is to --
13  they're basically making a summary judgment argument at
14  the front end of the case to say that we're not entitled
15  to the discovery to find out who is the proper party to
16  sue.  We are going to sue somebody.  Unfortunately, as it
17  sits here today, some innocent people might get named in
18  to this because they won't tell us.
19          And I do want to ask -- I do want address that
20  real quick.
21          THE COURT:  Let me go back to the previous
22  point about the fiduciary duty under common law, because
23  that's something that Mr. Richards and Concordia
24  challenges, is these directors owe a fiduciary duty to
25  Concordia but not to -- not any further up the
```

1  organizational chain.

2        And while, obviously, that is a matter for

3  summary judgment and, in some other context, it wasn't --

4  that premise wasn't being raised in the context it is

5  here, it seems like, yeah, if we're talking about some

6  other nonreligious corporation, then I wouldn't

7  determine -- I wouldn't kind of make that decision about

8  the extent of the fiduciary duty at the discovery phase.

9        MR. LEVATINO:  I see that.

10        THE COURT:  It's questionable and so, yeah, you

11 get the documents and we'll duke it out in summary

12 judgment.  But here we've got this added sort of filter,

13 an assertion of a First Amendment privilege, that seems

14 to require more scrutiny than I think would normally

15 apply.

16        MR. LEVATINO:  I see what you're saying,

17 Your Honor.  The thing that I would point out, and maybe

18 you'll see this in our first amended complaint when you

19 get into the weeds of it, is remember I said the

20 governance of this entity is the CTX bylaws and charter

21 and policy manual, layered in with the LCMS constitution

22 and bylaws.

23        The LCMS bylaws specifically state that these

24 people that Synod is electing to be on this board --

25 that's the other thing you've got to recognize, is the

1  LCMS is electing them to be on the board.  They're doing

2  it as a fiduciary for the synod.  It's specifically in

3  there that they accept -- they are doing this as a

4  fiduciary for the synod.

5          Of those board members that voted, at least ten

6  of them were elected pursuant to the bylaws of the synod.

7  Four of them were appointed by the synod.  Different

8  structures of the LCMS church were able to appoint

9  different people to sit on the board.  At least ten of

10 them.  And some of them, we don't know, maybe voted

11 against it.  We haven't seen.

12         But I wanted to point out one fact here, is all

13 Mr. Richards has to do is ask his board who voted for it.

14 It doesn't matter that they did it confidentiality on the

15 day that they did it, right?  The people that voted for

16 it know who they are, and they still sit on that board

17 today.

18         Some of them have resigned, and that's who we

19 were trying to get the depositions of, to ask them, did

20 you vote for or against.  I have a pretty strong guess of

21 which way they voted, since they resigned, but I don't

22 know for a fact.  And, in fact, when I contacted them, I

23 told them they needed their own counsel.  And so, you

24 know, I was sensitive to that.  I could have gone ahead

25 and asked them right then, but I didn't.

1        And so I'm trying to get it under sworn

2   testimony, with everybody around, to where I can ask them

3   the specific question of, when you had that date, when

4   November 8th of 2022 came forward, how did you vote?  And

5   if they tell me I voted to amend, they're going to be a

6   defendant in the case, a named defendant, not a John Doe

7   defendant.  If they said I voted against, they're not

8   going to get named.

9        So there is a compelling interest here, because

10  some innocent people might get sued because nobody will

11  tell us how they voted.  And so that's -- that's just --

12  that's something that's overlaid onto this.

13       THE COURT:  I guess, I mean, I don't know,

14  maybe you don't know and you don't need to comment on

15  this.  But does the Church itself not have a concern that

16  prosecuting a lawsuit this way against individual

17  directors might chill its ability to recruit directors in

18  the future, whether it's to this agency or others that

19  are part of the church?

20       MR. LEVATINO:  It could, right.  But at least

21  it would be transparent to them that we take this

22  serious.  And we've had to do this in the past to enforce

23  our bylaws.

24       I think it's just as chilling the other way, if

25  you have governance rules that the board members agree

1 that they're going to follow and then they don't follow

2 it.  And then to the Church can't -- the Church can't

3 enforce it.  They're going to start losing their agencies

4 left and right.

5 　　　　　　THE COURT:  I want to run something by you

6 here.  This a quote from I guess CTX's motion for

7 protection.  It's mentioned a couple of times in the

8 briefing.  But they say:  LCMS ostensibly agrees that the

9 notes, communications, and documents of a religious

10 institution's governing board is privileged under the

11 First Amendment, as it successfully argued this same

12 position in front of an Oregon court last year regarding,

13 in part, discovery requests which sought internal LCMS

14 communications regarding the governance of another

15 Concordia University.

16 　　　　　　I saw that and thought that's a pretty

17 compelling argument, but I don't know that it was

18 squarely addressed in anything that the LCMS filed here.

19 So I'd like to give you an opportunity to address why --

20 why I shouldn't care.

21 　　　　　　MR. LEVATINO:  Yes.  I'm not -- I'm not the

22 attorney on that case, so I'm not intimately familiar

23 with it.  But I do know the general nature of the lawsuit

24 is it's a claim by a third party against the church,

25 saying that they interfered with the university through

1  the process of appointing the president.

2           According to the synod bylaws, there is a

3  process for appointing a president, and either trying to

4  get into -- the third party in that case is trying to get

5  into the internal church decision-making of how they were

6  going to place somebody there.

7           That is squarely *Whole Woman's Health* First

8  Amendment time stuff, who was going to be appointed as

9  pastor, who is going to be appointed as an ecclesiastical

10  member of the university, because the -- the president of

11  the university for the LCMS is basically the spiritual

12  leader of the university and acts in a ministerial

13  capacity.  And so that's what's different about that

14  case.

15           THE COURT:  I'm still not seeing, I guess --

16  and this is probably a failing on my own -- it's

17  definitely a failing on my own part to fully understand

18  this third-party argument and the *Whole Woman's Health*

19  distinction.

20           But, again, I guess I keep coming back to, if

21  Concordia has -- if Concordia, I mean, accepting their

22  position as true for the sake of argument and for the

23  sake of the scope of discovery here and the scope of

24  privilege, if they have successfully voted to

25  disassociate with the Church -- and I get that that's a

1  fundamental premise, that the Church isn't going to

2  concede here.  But why shouldn't they be seen as a third

3  party or non -- nonparty or adversarial to the Church?

4        MR. LEVATINO:  Because they aren't.  The fact

5  is, is they're an agency of the LCMS.  They are a

6  specific entity created by the LCMS to go out and educate

7  people on the teachings of the Lutheran Church --

8  Missouri Synod to create church workers.  That was the

9  original intent of the university.  It still is a part of

10  the university.  I -- you know, that's how I would answer

11  that, Your Honor.

12        THE COURT:  And that's I guess -- and that's

13  also the ultimate -- one of the ultimate questions on the

14  merits, right?

15        MR. LEVATINO:  Absolutely.  So, you know, just

16  from the context of I know we're at the discovery stage

17  and we're not arguing the merits.  I also want to lay

18  something else over to the Court.  Remember, these --

19  these organizational documents of CTX were created

20  50-something years before *Masterson*.

21        THE COURT:  Uh-huh.

22        MR. LEVATINO:  And there is no way that they

23  were contemplating how that *Masterson* case would come

24  down 50 years before.  And, in fact, the law at that time

25  was clearly deference.

1          So -- but what I would tell you is, even if the
2   Court said that the Episcopal Church made an argument for
3   neutral principles, which they didn't, we clearly are.
4   We're clearly arguing that our governance under neutral
5   principles is permissible under *Masterson*, specifically
6   allowed under *Masterson*.  It does make clear that
7   ecclesiastical documents come into governance decisions,
8   and that's clearly what's happened here.
9          There was cross-reference throughout their
10  documents that show it was one whole governance body and
11  that they can't just look to one part of it to say they
12  win.
13          THE COURT:  Anything else you'd like for me to
14  consider?
15          MR. LEVATINO:  I have a lot of notes here, but
16  I'm not going to go through them here.  But, Your Honor,
17  thank you for your time.
18          THE COURT:  Thank you.
19          Mr. Richards, any rebuttal?
20          MR. RICHARDS:  If I may, briefly.  I meant to
21  show you this when I first got here.  And I don't know
22  how to operate this piece of equipment, but I'll just
23  tell you I asked in my discovery to the LCMS to produce
24  the documents and correspondence related to the CTX
25  amendments of our charter and bylaws.

1          And the objection I got was that that request

2    violates the First Amendment and the Religious Freedom

3    Restoration Act, which is essentially the same argument

4    I've made here today.

5          So, to me, I realize I haven't filed my motion

6    to compel, but clearly these lawyers and the LCMS believe

7    that to that request this applies.  How it would apply

8    for them and not apply for me, they have not explained to

9    you.  And so then they have to show you the need.

10          Another thing:  The document -- I agree that

11    this church -- I mean, this school existed prior to 1950.

12    But the document that created the thing, the governing

13    document, says:  The business of the corporation will be

14    conducted, and its affairs shall be controlled, by a

15    board of trustees.

16          That's who makes the decision.  And that's why

17    I said earlier I think this whole case is decided on this

18    document.  Either that's how it's done, or that's not how

19    it's done.  Either it's overlaid with the documents he's

20    talking about or it's not.  His claim that it is

21    important because somebody who shouldn't get sued might

22    get sued, they sued the right party.  The entity operates

23    with the board.  The duty is between the two entities,

24    and they have sued Concordia University Texas, and that's

25    the proper party.  There's no need to sue a board member.

1        He says I won't give you -- I won't stipulate

2   that they didn't commit bad faith or that they didn't do

3   something wrong.  His pleading does not have it in it.

4   We're here on his first amended petition.  It does not

5   have bad faith in it.  It does not have anything of that

6   nature in it.  And so he can't now come to you and say,

7   well, I might change that at some point.  So he sued the

8   right party.

9        The other argument he's made which I don't

10  understand, is that, somehow, whatever we did didn't

11  really cause anything.  Nothing really happened.  We're

12  still part of them.  We haven't gone away.  They have

13  kicked all of our employees out of the retirement plan.

14  They have fined us something in the neighborhood

15  of $4 1/2 million as a result of that, and they've

16  written us a letter which is in my pleadings, and you've

17  seen it, that says:  As a result of the actions taken by

18  Concordia University Texas, it has been determined that

19  the university is no longer considered a controlled

20  entity of the Lutheran Church - Missouri Synod.

21        That's what they visited upon me.  That's what

22  they visited upon my client.  And so to then come here

23  today and argue and say, oh, no, we're all still

24  buddy-buddy and we're the same folks is ridiculous.  It

25  has caused real financial problems for my folks, and my

1  folks have suffered it and my folks are paying the bill

2  for it.  But to somehow say, oh, no, it never happened is

3  absurd, by their own behavior.

4        The other thing they have done is they have

5  passed -- and this is the chilling effect.  They've

6  already passed in whatever convention they had that the

7  appropriate ecclesiastical supervisors need to

8  investigate and determine the appropriate disciplinary

9  action that should be taken against the CTX president and

10 any member of the board.

11        So the chilling effect already has occurred.

12 And the idea that somehow by giving them the names of

13 somebody that doesn't need to get sued, because the board

14 makes the decision, is going to not affect our ability to

15 get board members -- for that matter, you pointed out

16 part of the effect -- is absurd.

17        And so we take our First Amendment privilege

18 seriously.  It is a serious matter.  The right parties

19 are already here.  There isn't any reason to sue the

20 board members.  Either they get the campus back or they

21 don't.  Thank you.

22        THE COURT:  Can I -- well, I want to float --

23 this just came to me, right, so who knows?  But the --

24 the courts are the safeguard to our constitutional rights

25 that are enshrined in the Bill of Rights.  And we should

1  take every step we can to ensure that those aren't --

2  those rights aren't unnecessarily trampled on.

3          Here, the justification for permitting the sort

4  of discovery that Concordia and its John Doe board

5  members contend are shielded by First Amendment privilege

6  is the existence of a viable breach of fiduciary duty

7  claim, one that Concordia claims is -- shouldn't survive.

8          But is there -- could this not be -- maybe

9  that's a decision that could be carved out in -- well, I

10 guess I'm curious.  Are you not asking for sort of a

11 dispositive ruling in the form of a discovery ruling

12 here?  I mean, if I conclude that they can't get

13 discovery on a claim that is currently part of a live

14 pleading, then are you not asking for me to tie one hand

15 behind their backs as they try to litigate a claim that's

16 not yet been dismissed?

17         MR. RICHARDS:  Given the law of Texas and how

18 organizations are responsible for the organization's

19 acts, I do not think I'm tying their hand behind their

20 back.  They've sued the proper party.  John Does 1

21 through 12 do not have some title interest in the campus

22 or the assets of the university, and that's what they're

23 seeking to recover.  And so I have not tied their hands.

24         As I've stated to in my pleadings before,

25 either we had the authority to do this or we didn't.

1  And -- and, unfortunately, that's for you or Judge Ezra
2  to decide.  But it's not like they can go sue John Doe
3  Number 1 and get the University of Concordia campus back
4  from him.  He doesn't have it.  Neither do the rest of
5  them.  And so they've sued the proper party.  They have
6  no need to sue those guys.  I can guess why they want to
7  sue those guys, but that's not my position.  My position
8  is entities act as entities.
9          THE COURT:  Well, don't leave me in suspense.
10 What would be your guess as to why they sued?  Because I
11 think it does bear.  I mean, our speculation about the
12 motivations here and things like that do bear on, I
13 think, the chilling question.  And if a court could
14 make --
15         MR. RICHARDS:  Well, I shouldn't speculate.
16 But there has been social media posts, there have been
17 letters from whoever the chief folks are, calling us
18 un-Christian, calling us fill-in-the-blank, telling us
19 we're going to be punished.  And so I think it is just
20 more of that.  That's my speculation.
21         THE COURT:  Anything else you would like for me
22 to consider?
23         MR. RICHARDS:  No.  Thank you, Your Honor, for
24 your time.
25         THE COURT:  Thank you, Mr. Richards.

1              Anything more, Mr. Levatino?

2              MR. LEVATINO:  Just briefly, Your Honor.  In

3    regards to the evidence that they put before the Court

4    regarding being out of plan services, that's not part of

5    the LCMS Synod Board, the LCMS entity.  It's another

6    entity.  It is an LCMS entity, but it is not who the

7    plaintiffs are in this case.  So it's -- it's a third

8    party that sent them that letter.

9              The other thing is the guess on motive is

10   absolutely wrong.  The reason why the LCMS wants to name

11   individual board members is that they took a sacred oath

12   to uphold the LCMS bylaws, and they didn't.  And those

13   bylaws specifically said that any amendments to your

14   charter or your organization's bylaws must be first

15   approved by the LCMS.  They didn't do that.

16             THE COURT:  So there is -- obviously, there is

17   already pending dispositive motions, and they've been

18   referred to me for report and recommendation.  And that

19   is forthcoming.  But the viability under Texas law of

20   your breach of fiduciary duty claim I don't think is one

21   of the things that's being challenged.

22             I'm wondering if in order to -- I guess the

23   point I was going to make a minute ago, and then I sort

24   of went offtrack, but I wonder if this can be -- this

25   question in terms of fully protecting these John Does'

1    First Amendment rights could at least be -- if the only

2    reason they're subject to this sort of discovery -- and

3    maybe I'm wrong on this premise; tell me if I am -- is

4    because of the this -- the existence of this breach of

5    fiduciary duty claim that seems like could be addressed

6    in a 12(b)(6) type motion, couldn't that -- couldn't we

7    deal with -- what if CTX filed a motion to dismiss that

8    claim in like a 12(b)(6) type motion saying, look,

9    there's no cause of action here.  And then once you have

10   an up or down on that, then you know.  And then it seems

11   like maybe these people are more vulnerable to discovery

12   than we know right now.

13           MR. LEVATINO:  I see what you're saying,

14   Your Honor.  I don't think they can get there yet.  Their

15   dispositive motion that's before the Court that's pending

16   is a jurisdiction deal, saying there's not diversity.

17   And, you know, we're ready to argue that at the

18   appropriate time.  But they haven't put anything in any

19   dispositive motion about any of the claims not being

20   allowed by law.

21           And I think if the Court got into that before

22   it rules on the diversity question, on whether it has

23   jurisdiction, we'd all be wasting a bunch of time.

24           THE COURT:  Yep.  Anything else you'd like for

25   me to consider?

1          MR. LEVATINO:  No, Your Honor.

2          THE COURT:  Anything more, Mr. Richards?

3          MR. RICHARDS:  No.  Thank you, Your Honor.

4          THE COURT:  I appreciate counsels' argument and

5   preparation for today.  And I've enjoyed the

6   back-and-forth, and I think I found this to be a fruitful

7   exercise.  I don't always, but this definitely has been a

8   good, helpful hearing.  And I found the parties' briefs

9   to be helpful as well.

10          So thank you for taking the time to come down

11  and talk with me about this, and you will have my ruling

12  in due time.  I shouldn't keep you waiting too long.  All

13  right?

14          MR. RICHARDS:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16      (Proceedings concluded at 3:22 p.m.)

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3   was transcribed from an electronic recording made at the time

4   of the aforesaid proceedings and is a correct transcript, to

5   the best of my ability, made from the proceedings in the

6   above-entitled matter, and that the transcript fees and format

7   comply with those prescribed by the Court and Judicial

8   Conference of the United States.

9

10   /S/ Arlinda Rodriguez                February 17, 2025

11   ARLINDA RODRIGUEZ                    DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25